# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

E. I. DU PONT DE NEMOURS AND )
COMPANY, )
                         )    C.A. No. _____
        Plaintiff, )
                         )
    v.                    )    Jury Trial Demanded
                         )
MECHANICAL INTEGRITY, INC., )
                         )
      Defendant. )

## COMPLAINT

Plaintiff E. I. du Pont de Nemours and Company ("DuPont"), as and for its complaint

against Defendant Mechanical Integrity Inc. ("MI" or "Defendant"), alleges as follows:

### Nature of the Action

1.      This is an action for breach of contract, misrepresentation and fraud, based upon a

March 2004 contract between DuPont and MI.  Pursuant to that contract, Defendant MI was

required to perform an inspection of approximately 3,600 feet of pipeline used to carry

chloroform to DuPont's Louisville, Kentucky facility.  Due to MI's failure to properly conduct

the inspection, a serious leak in the pipeline caused a chloroform leak and DuPont was forced to

expend over $2,000,000.00 to remediate the area where the leak occurred.

### The Parties

2.      Plaintiff DuPont is a Delaware corporation with its principal place of business

located at 1007 Market Street, Wilmington, Delaware 19898.

3.      Defendant MI is a Texas corporation with its principal place of business located at

1423 First Street, Suite A, Humble, Texas 77338.

Jurisdiction And Venue

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because diversity of citizenship exists between the plaintiff and defendant, and the damages DuPont has sustained exceed $75,000.

5.      The Court has personal jurisdiction over the defendant pursuant to 10 *Del. C.* § 3104, because the parties' contract contains a provision whereby MI  consented and submitted exclusively to the jurisdiction and service of process of the courts of the State of Delaware or the courts of the United States located in Delaware.  (Ex. A ¶ 39).

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(c) because the defendant is subject to personal jurisdiction in this District.

Facts

7.      DuPont's Plant in Louisville Kentucky manufactures neoprene, or synthetic rubber, as well as ozone-safe, non-chlorofluorocarbon substitutes such as Suva® refrigerants and Dymel® propellants.

8.      On or about February 2, 2004, DuPont and MI entered into a contract, Purchase Order No. 4500104098, whereby MI agreed to perform a "guided wave" ultrasonic inspection on a four-inch diameter chloroform pipeline supplying the Louisville Plant.  (P.O. No. 4500104098 is attached hereto as Exhibit A.)  The Purchase Order expressly attached and incorporated DuPont's General Conditions.  (Ex. A.)  Together, the Purchase Order and the General Conditions comprise the contract between DuPont and MI (the "Contract").

9.      The pipeline which was to be inspected is approximately 3,600 feet long and is used to transport chloroform, a potentially environmentally hazardous material, from a contracted storage facility to the Louisville Plant.

2

10.    A portion of the pipeline traverses an adjacent site owned by Rohm and Haas Company, where it is routed under several road and railroad track crossings. Because these crossings prevent conventional inspection protocols from being used to assess the pipeline's condition, DuPont contracted with MI to utilize long-range ultrasonic technology as a screening tool to locate and characterize any defects in the pipeline.

11.    MI was aware that one of the purposes of the inspection was for DuPont to identify repair work that needed to be performed on the pipeline during the scheduled Louisville Plant shutdown in April 2004.

12.    MI conducted its inspection from March 31 through April 1, 2004, and was paid $13,429.97 by DuPont for these services.

13.    Following its inspection, MI issued an Inspection Report detailing its findings. (The "Report" which is attached as Ex. B.) The Report divided the pipeline into fifteen sections for purposes of the inspection and placed each section into one of three categories. A designation of Category 1 meant that the pipeline had less than 20% wall loss; Category 2 meant there was 20% to 50% wall loss, and Category 3 meant greater than 50% wall loss. Eleven of the sections were deemed by MI to fall into Category 1 and showed "no significant areas of concern"; four sections were deemed by MI to be Category 2 with "minor indications" of wall loss on the pipeline, and no section was designated by MI as being so deteriorated as to fall into Category 3.

14.    In reliance on MI's Inspection Report, in April 2004 DuPont repaired two of the areas of the pipeline that MI had designated as "Category 2," which showed some evidence of corrosion.

15.     On November 3, 2005, DuPont entered into another contract with MI, Purchase Order No. 4500405916, to perform a follow-up inspection of the pipeline. (Purchase Order No. 4500405916 is attached as Ex. C.) That inspection was scheduled to take place November 17-19, 2005.

16.     On November 18, 2005, a chloroform leak was discovered on a section of the pipeline that was previously inspected by MI and/or which MI reported to be within Category 1 and having "no significant areas of concern." The leak was found beneath a road crossing on the Rohm and Haas site.

17.     Because chloroform is a toxic material, as soon as the leak was observed, DuPont immediately initiated emergency response procedures and shut down the Louisville Plant's operations in an attempt to mitigate the leak. Despite DuPont's swift response, contamination of the soil and surface water could not be prevented.

18.     As a result of the chloroform leak, DuPont had to expend over $2,029,462.21 to remediate the soil and surface water adjacent to the spill location, as well as repair the pipeline.

19.     The external condition of the pipeline was so deteriorated that the corrosion of the pipe wall had to have been present, in a substantial degree, in March of 2004. Thus, MI's 2004 Inspection Report misrepresented the integrity of that section of the pipeline.

20.     When confronted with this discrepancy, MI admitted that, contrary to its Inspection Report, it did not inspect the area of the pipe where the leak occurred.

21.     Had MI properly inspected the area of the pipeline where the leak occurred, and reported its deteriorated condition to DuPont, DuPont would have immediately repaired the pipe, as was done with the pipe sections designated as Category 2. Thus, the chloroform leak would have been avoided.

22.    MI's failure to adequately inspect the pipeline and/or truthfully report its conduct to DuPont directly caused to the failure of the pipe wall and the resultant leak of chloroform.

## COUNT I:  BREACH OF CONTRACT

23.    DuPont repeats and realleges paragraphs 1 through 22 above as if fully set forth herein.

24.    Defendant MI is bound by the terms of the Contract, which required it to inspect all 3,600 feet of the pipeline specifically identified in the Contract, and accurately report its findings.

25.    MI breached its obligation by failing to adequately inspect the area of the pipeline where the leak occurred, and/or by reporting, inaccurately, that the pipe was in good condition at that location.

26.    As a result of MI's breach of the terms of the Contract, DuPont has suffered damages in excess of $2,000,000.00.

## COUNT II:  FRAUD
### (Pled in the Alternative)

27.    DuPont repeats and realleges paragraphs 1 through 26 above as if fully set forth herein.

28.    By virtue of the parties' Contract, MI had a duty to truthfully disclose the scope and results of its inspection of the pipeline.

29.    MI's Inspection Report falsely represented the condition of the pipeline where the leak occurred or, at the very least, omitted the fact that MI did not properly inspect the subject area of the pipeline.

30.    MI knew that the misrepresentations contained in the Inspection Report were false, and/or made the misrepresentation with reckless indifference to its truth.

31.    MI was aware that DuPont intended to rely upon the Inspection Report to identify repairs to the pipeline and, by issuing a false Inspection Report, MI intended to induce DuPont to refrain from conducting all necessary repairs.

32.    DuPont acted in justifiable reliance on the representations contained in the Inspection Report.

33.    As a result of its reliance on the false report, DuPont has suffered damages in excess of $2,000,000.00.

## COUNT III:  INTENTIONAL MISREPRESENTATION
### (Pled in the Alternative)

34.    DuPont repeats and realleges paragraphs 1 through 33 above as if fully set forth herein.

35.    MI deliberately concealed the fact that it did not inspect the area of the pipeline where the leak occurred and/or failed to accurately report the condition of the pipeline, despite its obligation to do so.

36.    The condition of the pipeline at all points along the 3,600 foot corridor was material, and, indeed, constituted the sole purpose of the parties' contract.

37.    MI acted with scienter because it knew that its Inspection Report contained false information about the integrity of the pipeline.

38.    MI was aware that DuPont intended to rely upon the Inspection Report to identify repairs to the pipeline.  By issuing a false Inspection Report, MI intended to induce DuPont to refrain from conducting all necessary repairs.

39.    DuPont acted in justifiable reliance on the representations contained in the Inspection Report.

40.    As a result of MI's concealment, DuPont has suffered damages in excess of $2,000,000.00.

## COUNT IV:   NEGLIGENT MISREPRESENTATION
### (Pled in the Alternative)

41.    DuPont repeats and realleges paragraphs 1 through 40 above as if fully set forth herein.

42.    By virtue of the parties' Contract, MI had a duty to truthfully disclose the scope and results of its inspection of the pipeline.

43.    MI's Inspection Report falsely represented the condition of the pipeline where the leak occurred or, at the very least, omitted the fact that MI did not properly inspect the subject area of the pipeline.

44.    MI failed to exercise reasonable care in conducting its inspection and in communicating the results of its inspection to DuPont.

45.    MI was aware that DuPont intended to rely upon the Inspection Report to identify repairs to the pipeline.

46.    DuPont acted in justifiable reliance on the representations contained in the Inspection Report.

47.    As a result of its justifiable reliance on the false report, DuPont has suffered damages in excess of $2,000,000.00.

## PRAYER FOR RELIEF

DuPont respectfully requests that this Court enter judgment in favor of DuPont, as follows:

(a)  against defendant MI for damages in the amount of at least $2,029,462.21;

(b) against defendant MI for pre- and post-judgment interest on the sum of all damages awarded to DuPont against the defendant;

(c) against defendant MI for punitive damages based on its reckless and/or intentional conduct;

(d) against defendant MI for the fees and costs incurred in asserting this action, including attorneys' fees; and

(d) such other and further relief the Court may deem just and proper.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

By: _Sarah E. DiLuzio_

Kathleen Furey McDonough (I.D. # 2395)
Sarah E. DiLuzio (I.D. # 4085)
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, Delaware 19801
Telephone: (302) 984-6000

*Attorneys for Plaintiff*
*E. I. du Pont de Nemours and Company*

Dated: June 1, 2007
790808v4/20120-435

# EXHIBIT A

**DU PONT**

E. I. du Pont de Nemours and Company
WILMINGTON, DE 19898 U.S.A.

MECHANICAL INTEGRITY INC
PO Box 398
HUMBLE TX   77347

| Purchase order |
| --- |

PO number/date
4500104098 / 02 Feb 2004
Contact person/Telephone
Fields, Kathy/502 775-3013
Our fax number
502 775-3032

Your person responsible
Donene Ashley

Your vendor number with us
8015960

Please enter our order as specified below subject to terms and conditions
listed on both the face and/or reverse side of this purchase order. Any
additional or different terms in seller's form(s) are material alterations and
are hereby rejected.
1. If price, terms, and required receiving date or other conditions and instructions
are not acceptable immediately advise buyer shown below.
2. Furnish complete shipping information and include 2 copies of packing list
with each shipment. Show purchase order number / release number on each
package, packing list, invoice, bill of lading, and all correspondence.

Please deliver to:
LOUISVILLE WORKS MFGG 2350 C5
4131
4200 CAMP GROUND RD.
LOUISVILLE KY   40216-4602

Mail your invoice to address indicated below:
E I DuPont de Nemours and Co., Inc.
Nashville Payment Center
P.O. Box 367
Old Hickory, TN 37138-0367

Terms of deliv.: 000 - Delivery terms do not apply
Terms of payt.: Net 60 days from receipt of invoice
Currency:       USD

Invoices shall be sent to:
  E. I. duPont de Nemours and Company
  P.O. Box 16350
  Louisville, KY  40256
  Attention:  Jennifer Leasor
Insurance certificates shall be presented to DuPont's at the site.
GENERAL CONDITIONS - Contractor will perform all services in
accordance with DuPont's General Conditions GC-1, dated 2-26-04 hereto
and made a part hereof.  Any inconsistent terms or conditions
submitted by Contractor shall not apply unless they are: (1) reduced
to writing and signed by both Parties hereto; and  (2) expressly
referred to as being modifications of the General conditions.
GUIDELINES FOR CONTRACTOR - Contractor shall comply with DuPont's

Send Collect freight invoices for US domestic orders to:
DuPont c/o Cass Information Systems
PO Box 17606
St Louis, MO 63178-7606

# DU PONT

**E.I. du Pont de Nemours and Company**

WILMINGTON, DE 19898 U.S.A

MECHANICAL INTEGRITY INC
PO Box 398
HUMBLE TX   77347

| PO number/date | Page |
| --- | --- |
| 4500104098 / 02 Feb 2004 | 2 /   4 |

Louisville, Kentucky Site Conditions dated 10/16/03, attached hereto
and made a part hereof.  Contractor and any subcontractors may be
required to furnish to DuPont a written safety program that all
Contractor and subcontractor employees shall be required to follow
while on the job site.  Minimum acceptable program shall meet OSHA and
DuPont's requirements

| Item | Material Order qty. | Unit | Description | Price per unit | Net value |
| --- | --- | --- | --- | --- | --- |

00010                         Inspect Chloroform Line at Rohm & Haas
             1.000   Perf Unit
      Deliv. date   Day 02/23/2004

Inspect Chloroform Line at Rohm & Haas
R Harold Skidmore  Phone (502) 775-3286  Contract Administrator

This order issued for contract inspection of the chloroform line
on Rohm and Haas property per quotation document #3151 and rate
sheet re-issued Feb. 27, 2004 from John D McMillan (Phone:
(281) 540-0314
Fax: (281) 540-0317)

John T Stamm  Phone (502) 775-3159

Work schedule as mutually agreed to by DuPont and Contractor.


Total quantity split over the following delivery dates:
                         Qty. Unit      Deliv. date

Send Collect freight invoices for US domestic orders to:
DuPont c/o Cass Information Systems
PO Box 17606
St Louis, MO 63178-7606

**DUPONT**

**E.I. du Pont de Nemours and Company**

WILMINGTON, DE 19898 U.S.A

| | | |
|---|---|---|
| MECHANICAL INTEGRITY INC | PO number/date | Page |
| PO Box 398 | 4500104098 / 02 Feb 2004 | 3 / 4 |
| HUMBLE TX  77347 | | |

| Item | Material | Description | | |
|------|----------|-------------|-----------|-----------|
| | Order qty. | Unit | Price per unit | Net value |

**The item covers the following services:**

| | | | | |
|---|---|---|---|---|
| 00020 | | INSPECT CHCL3 LINE AT ROHM & HAAS | | |
| | 1.000 | Perf Unit | 1,429.97 | 1,429.97 |
| | Deliv. date | Day 06/02/2004 | | |

INSPECT CHCL3 LINE AT ROHM & HAAS
Inspect Chloroform Line at Rohm & Haas
01/19/2004 19:08:46 R Harold Skidmore (PPM120) Phone (502)
775-3286
This order issued for contract inspection of the chloroform line
on Rohm
and Haas property.
Contractor: Mechanical Integrity, Inc.
            1423 East First Street
            Humble, TX  77338
            Phone: (281)540-0314
            Fax: (281)540-0317
01/20/2004 18:53:55 John T Stamm (OJ6165) Phone (502) 775-3159
3159
$12,000 ESTIMATE PER SKIDMORE
ADDING $1429.97 TO COMPLETE PO

Total quantity split over the following delivery dates:
                              Qty. Unit     Deliv. date

Send Collect freight invoices for US domestic orders to:
DuPont c/o Cass Information Systems
PO Box 17606
St Louis, MO 63178-7606

**DUPONT**

**E.I. du Pont de Nemours and Company**

WILMINGTON, DE 19898 U.S.A

MECHANICAL INTEGRITY INC
PO Box 398
HUMBLE TX  77347

PO number/date
4500104098 / 02 Feb 2004

Page
4 /    4

| Item | Material | | Description | | |
|------|----------|-----------|-------------|----------------|-----------|
|      | Order qty. | Unit |           | Price per unit | Net value |

**The item covers the following services:**
Expected value of unplanned services:          1,429.97

Send Collect freight invoices for US domestic orders to:
DuPont c/o Cass Information Systems
PO Box 17606
St Louis, MO 63178-7606

## GENERAL SERVICE CONDITIONS

These General Service Conditions apply to any contract, contract order, or other form of agreement in which they are incorporated by reference.

References to the Agreement include these General Service Conditions.

"DuPont" and "Supplier" are the Parties identified as such in the Agreement.

All headings of the Sections of these General Service Conditions and Addendum are inserted for convenience only and shall not affect any construction or interpretation of the Agreement.

### 1.   Definitions.
In addition to any terms defined elsewhere in the Agreement, the following terms have the following meanings:

(a)   "**Affiliate**" means any person, partnership, joint venture, corporation or other form of enterprise, domestic or foreign, including subsidiaries, which directly or indirectly Control, are Controlled by, or are under common Control with DuPont.

(b)   "**Control**" means the direct or indirect ownership of twenty percent (20%) or greater, or any lesser ownership interest if such is the maximum allowed by law.

(c)   "**Divested Business**" means any business unit, or any part or portion thereof, as reasonably determined by DuPont, which DuPont sells or otherwise transfers the assets or ownership to a third party acquirer. The term "Divested Business" shall mean such business unit or the acquirer thereof, as applicable.

(d)   "**Intellectual Property**" means copyrights (including the right to use, reproduce, modify, distribute, publicly display, and publicly perform the copyrighted work), trademarks (including trademark, trade names, service marks, and trade dress), patents (including the exclusive right to make, use and sell), trade secrets, rights of publicity, rights of privacy, moral rights, goodwill and all other intellectual property rights as may exist now and/or hereafter come into existence and all renewals and extensions thereof, regardless of whether such rights arise under the law of the United States or any other state, country or other jurisdiction.

(e)   "**Services**" means all of the services and work provided by Supplier as set forth in the Agreement and the Scope of Work.   Services will also include all of the current or future, necessary, customary, and appropriate services to the same extent that such services are, from time to time, provided by Supplier to its other customers when Supplier is supplying services substantially similar to the Services being provided hereunder, even if the specific services are not set forth in the Agreement.

(f)   "**Site**" means any DuPont or Affiliate owned or leased premises.

(g)   "**Trading Partners**" means current or potential: independent contractors, customers; and suppliers or vendors; and distributors, of DuPont and Affiliates.

(h)   Except as provided in any addendum to these General Service Conditions, "**Work Product**" shall mean all drawings, designs, specifications, models, perspectives, ideas and improvements, software and other Intellectual Property developed by Supplier for DuPont in the performance of Services.

### 2.   Services Provided by Supplier.
Supplier agrees to provide Services and such personnel as referenced in the Agreement, including the Exhibits hereto. Supplier shall, except as otherwise expressly stated herein, furnish sufficient, competent, fit and  knowledgeable personnel, materials, tools, equipment, facilities, permits and services, and do all things necessary to perform the work herein in a safe and environmentally sound manner.

### 3.   Location of Service.
Supplier's employees will perform Services at the location(s) provided in the Agreement.

### 4.   Personnel.
(a)   If service categories are referenced in the Agreement, then personnel, if any, provided by Supplier will be in one (1) or more of the referenced service categories. Services shall be performed in the best and most workmanlike manner by qualified and efficient personnel. DuPont has the right to advise of specific skills required and to review the qualifications of personnel prior to assignment. If DuPont advises Supplier that any individual assigned to DuPont work, or proposed for assignment to DuPont work, fails to meet the requirements set forth by DuPont, or is otherwise deemed unacceptable by DuPont for any other reason, then Supplier shall, at the option of DuPont, replace such individual. Should a Supplier employee assigned under the Agreement be unable to continue performing services because of illness, resignation or any other cause beyond Supplier's reasonable control, then Supplier will make reasonable efforts to replace such personnel with replacement personnel reasonably acceptable to DuPont. If Supplier fails to provide replacement personnel reasonably acceptable to DuPont, then DuPont reserves the right to eliminate all or part of the assignment without further liability.

(b)   In the event DuPont wishes to extend an assignment beyond the original expiration date, DuPont will notify Supplier at least fifteen (15) days prior to said expiration. Supplier shall supply the same personnel during the agreed-to extension period unless otherwise determined by DuPont.

(c)   DuPont shall have the right to reduce the duration of any assignment at any time. Upon notice from DuPont for any reason (other than a reason prohibited by applicable laws, rules or regulations), Supplier shall remove any Supplier employee as soon as practical.

### 5.   Scope.
Supplier hereby agrees that any Affiliate, domestic or foreign, shall have the right, but not the obligation, to receive services under the terms and conditions of the Agreement, without additional royalty or charge, by providing Supplier with written notice of the Affiliate's election to so receive services. If DuPont or the non-United States Affiliate deem it appropriate to conform the terms and conditions of the Agreement to local law, custom and practice, Supplier or its affiliate will use commercially reasonable efforts to enter into

- DuPont Confidential -

a local written agreement to so effectuate the provisions of the Agreement.

### 6.   Independent Contractor.
The employees, subcontractors, methods, facilities and equipment used by Supplier shall be at all times under its exclusive direction and control. Supplier's relationship to DuPont under the Agreement shall be that of an independent contractor, and nothing in the Agreement shall be construed to constitute Supplier, its subcontractors or any of their employees as an employee, agent, associate, joint venturer, or partner of DuPont. It is agreed that Supplier's employees, who are assigned to DuPont work under the Agreement, shall at all times be and remain employees of Supplier.

### 7.   Cooperation with DuPont Contractors.
Supplier shall cooperate in good faith with DuPont and any DuPont contractor, to the extent reasonably required by DuPont. This cooperation will include, by providing, from time to time, as necessary or appropriate, in writing, to the extent available, applicable requirements, standards and policies for the Services so that the goods and services provided by the DuPont contractor:
(a)   may be:
    (i)   integrated with the goods and services, including the Services DuPont or any third party and
    (ii)   operated by Supplier, DuPont or any other third party and

(b)   are compatible with the DuPont or contractor computer systems in each such case to the extent necessary to provide the Services.

### 8.   Subcontracting and Offshore Outsourcing.
Supplier's obligations hereunder shall be performed solely by employees of Supplier. Supplier shall not, without DuPont's prior written consent, subcontract or delegate performance of any of its obligations hereunder. Supplier shall be fully responsible for the performance of any such subcontractor or agents. Supplier will not, directly, indirectly or via subcontractors or agents, provide any Services from locations outside the United States without the prior written consent of DuPont.

### 9.   Work Product and Title.
Supplier hereby assigns to DuPont all rights, title and interest in and to all Work Product. This assignment shall not include previously patented or copyrighted Intellectual Property by Supplier or a third party. However, Supplier hereby grants to DuPont and its Affiliates a nonexclusive, royalty-free, worldwide, perpetual license to use such Supplier or third party Intellectual Property only in conjunction with the use of Work Product.

Should any Work Product qualify for protection under United States patent or copyright law or similar laws in other relevant countries and if DuPont wishes to apply for Intellectual Property protection in the United States or foreign countries, Supplier, at the request of DuPont, shall provide all reasonable assistance to obtain patent and copyright protection or other Intellectual Property protection including execution of papers deemed necessary or advisable for the filing and prosecution of applications, and for providing confirmation of the legal title of DuPont to the inventions, applications, and any Intellectual Property rights granted. DuPont shall bear all costs involved.

### 10.   Assignment.
The Agreement shall not be assignable or otherwise transferable, in whole or in part, by Supplier. The

Agreement shall be assignable or otherwise transferable in whole or in part by DuPont. The terms of these General Service Conditions shall be incorporated into all tier subcontracts.

### 11.   Supplier Diversity.
As required of DuPont by applicable law (e.g., 15 USCA 637) in the United States, and contracts to pass along (i.e., "flow down") to Supplier and to assist DuPont in complying with its corporate supplier diversity goals:

(a)   Supplier shall provide the maximum practicable opportunity to participate in the performance of the Agreement to the types of businesses categorized and defined by applicable law, the U.S. Small Business Administration and the National Minority Supplier Development Council (e.g., small business concerns, including the various types thereof, and minority owned businesses). Supplier shall carry this out in the awarding of subcontracts to such businesses to the fullest extent consistent with the efficient performance of the Agreement.

(b)   Supplier shall (i) report to DuPont, on a quarterly basis, the portion allocated to DuPont of the amounts paid by Supplier to such businesses or (ii) designate an individual who will provide such information to the DuPont Office of Supplier Diversity.

(c)   If required by the Small Business Act, Supplier shall cooperate in studies or surveys to determine compliance with this Section and shall adopt a subcontracting plan as described in such act.

### 12.   Child and Forced Labor Prohibition.
Supplier is fully aware of the DuPont Child and Forced Labor Principles ("DuPont Principles"). Supplier certifies that it does not and will not employ any person to perform services, provide product, or manufacture or supply material for DuPont who is under sixteen (16) years of age, or eighteen (18) years of age in the case of hazardous services or work (hereinafter "Child Labor"), unless Supplier first obtains the written approval of the Vice President of DuPont Sourcing & Logistics.

Supplier certifies that the workers it uses, and will use, to produce product, provide services, or manufacture or supply material are present voluntarily. Supplier certifies that it does not and will not knowingly use forced labor as it is defined in the DuPont Principles.

Supplier understands that these certifications and undertakings are essential to the Agreement. Supplier agrees to indemnify DuPont and hold DuPont harmless with respect to any liability arising from the contravention of this Section by Supplier. Supplier also agrees that, in the event that DuPont determines that a violation of this Section has occurred, DuPont shall notify Supplier and Supplier shall immediately remedy the violation. In the event that DuPont determines that Supplier has not remedied the violation, then DuPont may terminate the Agreement immediately, and such termination shall be with cause.

### 13.   Safety and Health.
Supplier shall:

(a)   comply with all federal, state, and local regulations, and all safety information and instructions as may be set forth in writing or otherwise provided by DuPont, as well as all Site rules and conditions.

- DuPont Confidential -

Copyright © 2005 E. I. du Pont de Nemours and Company. All rights reserved.

(b)  designate one (1) person to be responsible for carrying out Supplier's obligations under this Section;

(c)  promptly
   (i)  report to DuPont all incidents with potentially adverse safety, health or environmental implications, including slips, falls, equipment malfunctions, fume releases and any situation requiring first-aid or medical observation or treatment, and
   (ii)  include, whenever practicable, on-site DuPont medical personnel in the evaluation (by consultation, physical observation, or otherwise) of the involved employees of Supplier;

(d)  promptly report to DuPont all cases Supplier determines to be recordable on the OSHA 300 log or its equivalent and, upon request, provide DuPont with a copy of the OSHA 300 log and all supporting forms;

(e)  maintain an educational program to assure the inclusion of safety instructions as a part of job assignment; and

(f)  properly maintain, inspect, and supervise its designated work area and roadways to prevent unsafe work conditions from existing. The responsibility includes Supplier's right and duty to conduct reasonable and necessary maintenance in the work area and of the roadways to prevent unsafe work conditions from existing. Supplier shall regularly conduct safety audits and inspections to ensure compliance with its responsibility to maintain a reasonably safe work area.

Supplier must arrange for first-aid, emergency medical treatment, routine medical treatment, fitness for duty evaluations, drug testing, and other routine occupational medical services; although, upon request and in other appropriate circumstances, DuPont may provide first-aid and emergency medical treatment to stabilize Supplier's employees in connection with on-site incidents or medical emergencies.

If DuPont notifies Supplier of any noncompliance with the provisions of this Section, Supplier shall (immediately, if so directed; otherwise in not more than forty-eight (48) hours after receipt of such notice) make all reasonable efforts to correct the existing conditions. If Supplier fails to correct the existing conditions, DuPont may suspend all or any part of the Services under the Agreement or may terminate the Agreement, without penalty, immediately upon written notice thereof to Supplier. In all other respects, such termination shall be in accordance with the other Sections of the Agreement. In the event Services are suspended, when satisfactory corrective action has been taken by Supplier, a start order shall be issued by DuPont. No part of the time lost due to any such work suspension shall be made the subject for claim for extension of time or for additional costs or damages by Supplier.

### 14.  Substance Abuse.
Supplier shall advise its employees and the employees of its subcontractors and agents that:

(a)  it is the policy of DuPont to prohibit use, possession, sale, manufacture, dispensing, and distribution of alcohol, drugs, or other controlled substances on a Site, and to prohibit in the workplace the presence of an individual with such substances in the body for non-medical reasons;

(b)  entry onto a Site constitutes consent to an inspection of the Supplier employee's person, vehicle, and personal effects when entering, while on, or upon leaving a Site; and

(c)  any Supplier employee who is found in violation of the policy or who refuses to permit inspection may be removed or barred from a Site at the discretion of DuPont.

Supplier, upon request of DuPont, shall not assign or reassign any employee to operations on a Site unless such employee has taken a drug and controlled substance test satisfactory to DuPont, and the test has proved negative for those drugs and controlled substances listed in the document titled "Minimally Acceptable Drug and Alcohol Testing", incorporated herein by reference, copies of which are available to Supplier from the DuPont Contract Administrator.

Supplier also, upon request of DuPont, shall develop and implement procedures, satisfactory to DuPont, to test its employees for alcohol, drug, and controlled substance use when Supplier suspects that a performance deviation, an incident, or unusual behavior of one (1) of Supplier's employees on a Site is related to drug or controlled substance use.

In connection with the above alcohol, drug, and controlled substance testing requirements, Supplier shall secure the written consent of its employees to release results of such tests to DuPont. DuPont shall use such test results only in connection with its decision to permit Supplier's employee to enter or remain on a Site, and to monitor contract compliance. Supplier shall ensure that all drug and controlled substance testing under this Section meets the minimum requirements set forth in the document titled "Minimally Acceptable Drug and Alcohol Testing".

All requirements of this Section shall apply only to the extent permitted by the law of the place where the Services are to be performed.

### 15.  Criminal Background Checks.
To the fullest extent permitted by law, prior to assigning any Supplier employee to perform any Services on a Site, Supplier shall have performed a criminal background check to determine whether such Supplier employee has been convicted of any felony or misdemeanor crime during the prior seven (7) year period, or has any known criminal convictions that occurred beyond the seven (7) year period. Supplier shall not, without the prior written approval of DuPont, permit a Supplier employee to perform Services on a Site if that Supplier employee has been convicted of any felony or misdemeanor crimes.  Supplier's criminal background check program must be in compliance with the Fair Credit Reporting Act and DuPont Contractor Criminal Background Investigation Requirements. In the event of an emergency, and only during the time such criminal background check is being performed, a Supplier employee may temporarily perform Services on a Site if such Supplier employee is escorted one hundred percent (100%) of the time by a DuPont employee.

### 16.  Authority.
The Parties hereby represent that they have full power and authority to enter into the Agreement and perform their respective obligations and duties hereunder, and do not know of any contracts, agreements, promises or undertakings that would prevent the full execution and performance of such obligations and duties.

General Service Conditions
Copyright © 2005 E. I. du Pont de Nemours and Company. All rights reserved.

### 17. Working Arrangements.

DuPont will provide working space, and other services and materials, as DuPont deems appropriate, that may be necessary in connection with the performance of the Services on the Site described in the Agreement. Unless specifically requested by DuPont, Supplier's employees shall only provide Services during the normal working hours of DuPont. While on Site, Supplier's employees shall confine themselves to areas designated by DuPont. Supplier's employees will be subject to the badge and pass requirements of DuPont in effect at the site of the Services. Supplier shall also comply with all Site rules, regulations, and guidelines of whatever nature while performing Services at the Site.

### 18. License Grant.

For the term of the Agreement, any term extension, and any termination assistance period hereunder, Supplier hereby grants to DuPont (and DuPont Affiliates and Trading Partners) a fully paid-up, royalty free, worldwide, nonexclusive license to access and use the Services and any Supplier Intellectual Property necessary or appropriate to access and use the Services by an unlimited number of users in accordance with the Agreement (the "License"). The License includes the right: (a) to access and use Services for the benefit of DuPont, Affiliates, any Divested Businesses, and any Trading Parties; and (b) for third parties to access and use the Services, provided such access and use by third parties is to communicate, share or access information, or transact business between or with DuPont, Affiliates, Trading Partner or any Divested Businesses.

### 19. Compensation and Payment.

As full compensation for Services and other obligations under the Agreement, DuPont shall pay Supplier in accordance with the conditions and rates shown in the Price Schedule attached to the Agreement.

### 20. Payment Terms.

Terms of payment shall be net sixty (60) days after DuPont receives a properly prepared and correct Supplier invoice. Supplier's invoice shall be accompanied by such records or other written proof as DuPont deems adequate to verify the billings appearing therein and shall be in a form as may be prescribed by DuPont's Contract Administrator. A properly prepared and correct invoice is an original document received at the proper DuPont address, as designated in an applicable purchase order, that clearly and legibly includes, as a minimum:
(a)  the DuPont Contract Order number and release number (if applicable);
(b)  Supplier's complete name and remit to address;
(c)  "bill to" stating the applicable DuPont entity;
(d)  a detailed description of the Services and/or Materials;
(e)  price, consistent with the Agreement;
(f)  quantity, consistent with the Agreement;
(g)  unit of measure, consistent with the Agreement;
(h)  Supplier's invoice number;
(i)  invoice date;
(j)  total monetary amount and currency base;
(k)  terms of payment, including any applicable discount calculations;
(l)  freight terms;
(m)  if applicable, tax amount/rate information; and
(n)  bill of lading number, rail car number or packing list number as appropriate.

Incomplete invoices shall be returned to Supplier unpaid and unprocessed.

If Supplier's invoice does not indicate that Supplier is an incorporated entity, by use of the words (or abbreviations) "Incorporated", "Corporation", or "P.C." as a part of Supplier's company name, then Supplier shall display its tax identification number (TIN) on the invoice in lieu of such designations. Failure to furnish such information may result in withholding appropriate amounts in accordance with IRS regulations.

Payment shall be considered made when payment checks are mailed by DuPont or when electronic funds transfer through the Automated Clearing House (EFT/ACH) is initiated by DuPont. Supplier's invoice shall be accompanied by such records or other written proof as DuPont deems adequate to verify the billings appearing therein.

Should payment not be received by Supplier as required hereunder, Supplier shall so notify DuPont. Thereafter, Supplier and DuPont shall have thirty (30) days to determine why payment was not received (or sent) and to take such steps as may be reasonably required to comply with these provisions and ensure ongoing compliance with the same.

### 21. Taxes.

Unless otherwise stated in the Agreement, DuPont shall pay value-added tax (VAT), Goods and Services Tax (GST), use, transfer, and similar taxes and surcharges (regardless of how they are denominated) levied by a taxing authority against or upon the goods and/or services (collectively, the "Taxes"). In the alternative, DuPont will provide Supplier with a certificate evidencing exemption of DuPont from payment of or liability for such Taxes. DuPont shall, without liability to Supplier, withhold income or other taxes from payments to Supplier to the extent that such withholding tax may be required by any taxing authority. In no event shall DuPont be responsible for Taxes based upon the net income or assets of Supplier, nor shall DuPont be responsible or liable for any penalties or interest due as a result of Supplier's failure to timely pay any Taxes attributable to the goods and/or services or to timely notify DuPont of such Taxes.

### 22. Lower Competitive Offer.

If at any time DuPont: (a) receives a bona fide offer from a third party to perform or provide comparable or superior Services, in whole or in part, under more favorable terms or at a lower total economic cost to DuPont, including all freight costs, for all or part of such Services performed hereunder; or (b) seeks competitive offers in the marketplace for Services, whether through a bid process or otherwise, and obtains a price and terms that DuPont determines separately or as a package offer lower overall cost to DuPont than the price and terms in effect hereunder, DuPont will notify Supplier of such offer and provide Supplier the opportunity to either be competitive or decline to do so. Supplier's opportunity to participate in the bid process constitutes Supplier's opportunity to exercise this competitive offer provision and be competitive. If Supplier declines to meet the competitive offer, DuPont has the right to purchase any or all Services from the unrelated third party supplier. Any purchases from the unrelated third party supplier shall reduce any amount DuPont is obligated to purchase hereunder.

### 23. Most Favored Nation.

Supplier shall not sell goods, materials, or products purchased under the Agreement nor provide services or comparable services, in whole or in part, to those covered herein, to third parties on better terms or at fees lower than

those set forth herein, without offering such terms or fees to DuPont.

**24.  Business Ethics.**
Supplier shall not pay any salaries, commissions or fees (or make any other payments or rebates) to any employee, officer or director of DuPont (or any designee of such employee, officer or director) or favor any such individual with gifts, entertainment, services or goods.

**25.  Records Retention and Site Visitation.**
(a)  Supplier agrees to maintain, in accordance with generally accepted accounting principles and practices, such records as may be necessary to adequately reflect the accuracy of Supplier's charges and invoices under the Agreement, and to maintain such other additional records as DuPont may from time to time reasonably require.  Supplier shall preserve such records for a minimum period of three (3) years from the date of last payment or completion of any relevant federal tax audit, without additional reimbursement or compensation therefore.

(b)  Upon notice from DuPont, Supplier shall provide DuPont, its agents and any of its regulators, accountants and auditors (collectively, the **"DuPont Auditors"**) with access to, and any assistance and information that they may require with respect to, the Service locations and Services for purposes of auditing Supplier's compliance with the Agreement (including compliance with the DISO Standards) and the business of DuPont (including compliance with applicable law.  If Supplier is notified that an audit identifies that:  (1) Supplier is not in compliance with the Agreement, Supplier shall promptly correct such non-compliance; or (2) DuPont is not in compliance with applicable law due to Supplier's acts or omissions, Supplier shall promptly correct such acts or omissions.

**26.  Confidential Information.**
(a)  Until the number of years set forth in the Agreement after the termination or expiration of the Agreement, any term extensions, and any termination assistance periods provided for in an addendum to these General Service Conditions, or in perpetuity in the case of trade secrets, Supplier shall not disclose to or permit to be used by (except in the furtherance of its responsibilities and obligations hereunder) any third party or entity any technical, commercial, organizational, scientific or business information, or Intellectual Property, of DuPont, Affiliates or Trading Partners, or any other information or Intellectual Property of DuPont or Affiliates designated as confidential at the time of disclosure, or if disclosed orally, designated orally as confidential at the time of disclosure and confirmed in writing within thirty (30) days after such disclosure (collectively **"Confidential Information"**) disclosed to, learned by, or developed by it, its employees or agents under the Agreement.  In addition Supplier shall (i) not use the Confidential Information of DuPont other than to fulfill its obligations under the Agreement; (ii) not allow access to the Confidential Information to personnel who do not need access to such information in order to fulfill Supplier's obligations hereunder and; (iii) protect the Confidential Information with at least the same level of care as it uses for its own confidential information of a similar nature but not less than a reasonable level of care.

These restrictions on use and disclosure shall not apply to:

(i)    Confidential Information already known to Supplier when it was disclosed by DuPont as demonstrated by prior existing written records of Supplier;

(ii)   Confidential Information that is or becomes known to the public through no fault of Supplier, its employees, or agents;

(iii)  Confidential Information that is lawfully received by Supplier from a third party where the third party has not required Supplier to maintain the information in confidence;

(iv)   Confidential Information developed by Supplier independently of disclosure by DuPont; and

(v)    Confidential information required to be disclosed by court order or otherwise by applicable law.

(b)  The foregoing obligations of confidentiality also extend to and bind the employees, permitted subcontractors and agents of Supplier who have been provided access to Confidential Information by Supplier.

(c)  Upon request of DuPont, Supplier shall return to DuPont all Confidential Information and all written descriptive matter, including drawings, program listings, blueprints, descriptions, or other papers or documents, which contain or summarize any Confidential Information.

(d)  If the Parties have previously entered into a Confidential Information Agreement (**"Other Agreement"**), the terms of that Other Agreement shall take precedence over the terms of this Confidential Information Section with respect to information that is covered by both this Confidential Information Section and by the Other Agreement, but only to the extent that the Other Agreement offers greater protection for such items than the protection provided for in this Confidential Information Section.

(e)  The Agreement and its terms and conditions are considered Confidential Information.

**27.  Unauthorized Acts.**
Each Party shall:
(a)  promptly notify the other Party of any material unauthorized possession, use or knowledge, or attempt thereof, of the other Party's Confidential Information by any person or entity which may become known to such Party;

(b)  promptly furnish to the other Party full details of the unauthorized possession, use or knowledge, or attempt thereof, and assist the other Party in investigating or preventing the recurrence of any unauthorized possession, use or knowledge, or attempt thereof, of Confidential Information;

(c)  cooperate with the other Party in any litigation and investigation against third parties deemed necessary by the other Party to protect its proprietary rights; and

(d)  promptly use its best efforts to prevent a recurrence of any such unauthorized possession, use or knowledge, or attempt thereof, of Confidential Information.

Each Party shall bear the cost it incurs as a result of compliance with this Section.

**28.  Compliance With Laws and Nondiscrimination.**
Supplier shall comply with all applicable laws, ordinances, rules and regulations of governmental authorities, including any import and export control laws and regulations, and, in the United States, all applicable laws, ordinances, rules and regulations covering the production, sale and delivery of the Services, including the Equal Opportunity Clause prescribed in 41 CFR 60-1.4; the Affirmative Action Clause prescribed in 41 CFR 60-250.4, regarding disabled veterans and

- DuPont Confidential -

Copyright © 2005 E. I. du Pont de Nemours and Company.  All rights reserved.

veterans of the Vietnam Era; the Affirmative Action Clause for Handicapped Workers prescribed in 41 CFR 60-741.4; 48 CFR Chapter 1 Subpart 19.7 regarding Small Business and Small Disadvantaged Business Concerns; Affirmative Action Compliance Program (41 CFR 60-1.40); the annual filing of SF-100 Employer Information Report (41 CFR 60-1.7); 41 CFR 60-1.8 prohibiting segregated facilities; the Fair Labor Standards Act of 1938, as amended; the Sarbanes-Oxley Act of 2002, Section 303 and Securities Exchange Act of 1934, as amended, Rule 13b2-2.

### 29.  Representations and Warranties.
Supplier represents and warrants:

(a)  All obligations shall be performed in a prompt and professional manner in accordance with industry standards and the Agreement (including any milestones, service levels, or dates set forth therein), free of errors or defects in design, material and workmanship.

(b)  It owns all right, title, and interest in and to, or has sufficient right, title, and interest in, the Services and Supplier Intellectual Property to provide the Services as set forth in the Agreement and to convey to DuPont the rights, Licenses set forth in the License Grant Section and assign the ownership rights pursuant to the Work Product and Title Section herein.

(c)  In the event of breach of the warranties set forth in this Representations and Warranties Section, Supplier, at its expense, shall correct (by repair, replacement or re-performance) such breach as soon as possible, but not more than ten (10) days after notice from DuPont.  If the breach is not so corrected, then DuPont, at its option, may either: (i) extend the time for Supplier to correct such breach, if correction is commercially reasonable; (ii) negotiate an appropriate reduction in or refund of Supplier's compensation; or  (iii) terminate the Agreement, in which case, in addition to any other right or remedy DuPont may have, Supplier shall immediately refund to DuPont all amounts paid hereunder.  If DuPont selects option (i) but the breach is still not corrected within the extended time, DuPont shall have the same options again.

(d)  EXCEPT AS PROVIDED IN THE AGREEMENT, SUPPLIER MAKES NO IMPLIED WARRANTIES REGARDING THE SERVICES AND SPECIFICALLY DISCLAIMS THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

### 30.  General Indemnity.
Each Party ("Indemnitor") shall, to the extent permitted by law, indemnify, defend and hold harmless the other Party from and against any and all claims, demands, complaints or actions of third parties (including employees of the Parties or government agencies) arising from or relating to the Agreement (including personal injury, death, property damage or damage to the environment), to the extent caused or arising out of the negligence, willful misconduct, breach of this Agreement or a related agreement, or violation of law of or by the Indemnitor or any subcontractor of the Indemnitor.  Further, in the event the Parties are jointly at fault or negligent, they agree to indemnify each other in proportion to their relative fault or negligence.  The claims, demands, complaints and actions covered hereunder include all settlements, losses, liabilities, judgments, court costs, reasonable attorneys' fees, fines, penalties and other litigation costs and expenses arising from or related to such claims, demands, complaints or actions.

### 31.  Infringement Indemnity By Supplier.
Supplier will indemnify, defend and hold harmless DuPont from and against any and all claims, demands, complaints, or actions of third parties (including employees of the Parties or government agencies) arising from or relating to the Agreement brought against DuPont alleging that the Service or use of Supplier Intellectual Property infringes any patent, copyright, trade secret or other intellectual property right. The claims, demands, complaints and actions covered hereunder include all settlements, losses, liabilities, judgments, court costs, reasonable attorneys' fees, fines, penalties and other litigation costs and expenses arising from or related to such claims, demands, complaints or actions.

If such a claim is brought against DuPont, DuPont shall give prompt written notice thereof to the Supplier.  At Supplier's cost, (a) Supplier shall immediately take control of the defense of such claim and shall engage attorneys acceptable to DuPont to defend such claim and (b) DuPont shall cooperate with Supplier (and its attorneys) in the defense of such claim, provided, however, that DuPont may, at its own cost, participate (through its attorneys or otherwise) in such defense.  No settlement of a claim that involves a remedy other than the payment of money by the Supplier shall be entered into without the consent of DuPont. If Supplier does not assume control over the defense of a claim as provided in this Section, DuPont may defend the claim in such manner as it may deem appropriate, at the cost of the Supplier.  Should use of the Service or Supplier Intellectual Property become, or in the opinion of Supplier be likely to become, the subject of such an infringement claim, Supplier may, at its expense and option, (i) procure for DuPont the right to continue using or receiving the Service or Supplier Intellectual Property free of any liability, or (ii) replace or modify, in whole or in part, the Services or Supplier Intellectual Property to make them non-infringing without degradation.

### 32.  Insurance.
(a)  Supplier, at its expense, shall carry and maintain in force at all times relevant hereto the following insurance, on policy forms and with insurance companies authorized to do business in the jurisdiction(s) where work is to be performed and acceptable to DuPont, at the indicated minimum coverage limits, or such higher limits as DuPont may require, or the limits provided under insurance currently held by Supplier as of the Effective Date of the Agreement, whichever is greater.

(i)    Workers' Compensation - Statutory; Employer's Liability - $500,000 per accident/per employee; and such other insurance as may be required by Statutory law.  This policy shall include a waiver of subrogation to DuPont.

(ii)   Commercial General Liability (Occurrence Form), including Contractual Liability and liability for Products and Completed Operations, in a combined limit for Bodily Injury and Property Damage - $1,000,000 per occurrence. This policy shall name DuPont as additional insured.

(iii)  Business Automobile Liability, in a combined single limit for Bodily Injury and Property Damage - $1,000,000 per occurrence.

(iv)   Other insurance appropriate for Supplier's business or as required by law.

Copyright © 2005 E. I. du Pont de Nemours and Company.  All rights reserved.

(b)  Supplier shall maintain in force the insurance required by this Section and shall seasonably renew all required coverage during the term of the Agreement.

(c)  Upon the request of DuPont, Supplier shall provide DuPont with certificates of insurance evidencing the coverage. Such certificates shall provide that the insurer will give DuPont at least thirty (30) days advance notice of any changes in, or cancellation or non-renewal of, coverage and note any exclusions. If, in connection with the performance of Services under the Agreement, Supplier will not use motor vehicles on the Site other than parking areas, a letter so stating is acceptable in lieu of the automobile insurance certificate.

(d)  Supplier shall require that any subcontractor it employs carry the same coverage in the same limits as set out above, and other coverage as Supplier deems appropriate and shall provide proof.

(e)  Neither failure of Supplier to comply with any or all of the insurance Sections of the Agreement, nor the failure to secure endorsements on policies as may be necessary to carry out the terms and Sections of the Agreement, shall be construed to limit or relieve Supplier from any of its obligations under the Agreement, including the Insurance Section.

### 33.  Term.
The Agreement shall commence as of the Effective Date on the contract order and shall continue in full force and effect for the period set forth in the Agreement unless earlier terminated in whole or in part, as set forth herein: (i) in accordance with the Insolvency; Reorganization Section or other Sections hereof; or (ii) by DuPont, at any time, without cause, upon thirty (30) days prior notice. Termination pursuant to (ii) shall be accomplished without penalty, and shall not relieve or release either DuPont or Supplier from any rights, liabilities or obligations that have accrued under the law or the Agreement prior to the date of such termination. Supplier shall immediately cease work upon receipt of any notice of termination from DuPont, unless otherwise specified by DuPont in the notice. DuPont will have the right and option, but not the obligation, to extend the Agreement for an additional number of consecutive one (1) year periods as set forth in the Agreement after the expiration of the initial term or any term extension by providing Supplier with at least thirty (30) days notice thereof prior to the expiration date of the initial term or any term extension, as appropriate.

### 34.  Replacement of Prior Agreements.
The Agreement shall take the place of and entirely supersede any oral or written contracts, agreements, or arrangements that deal with the same subject matter as referenced herein between DuPont and Supplier and set forth in the contract order except for any rights, obligations and liabilities which by the terms of that agreement or the law survive its expiration, termination or cancellation.

### 35.  Termination for Cause.
Either Party may terminate the Agreement if the other Party has materially breached its obligations under the Agreement and fails to correct the breach within thirty (30) days after the defaulting Party's receipt of notice of such breach. The non-defaulting Party also may exercise any other rights available to it at law or in equity.

### 36.  Insolvency; Reorganization.
If Supplier shall: (i) dissolve, transfer, sell, assign, mortgage, encumber, pledge, or otherwise dispose of substantially all of its assets used to perform its obligations hereunder, its accounts receivable from DuPont or over twenty percent (20%) of its ownership or controlling interest (whether in the form of stock or otherwise); (ii) consolidate with or merge into another corporation or permit one (1) or more other corporations to consolidate with or merge into it; (iii) be adjudged bankrupt, make a general assignment for the benefit of its creditors or become insolvent and a receiver shall therefore be appointed; or (iv) contemplate or reasonably expect the occurrence of any event referred to in this Section; then in each case, Supplier shall give DuPont notice of such occurrence as soon as is legally permissible. If such occurrence or proposed occurrence is unacceptable to DuPont, DuPont may terminate the Agreement immediately upon notice thereof to Supplier. Such termination shall be considered termination for cause.

### 37.  Payment upon Termination.
In the event of termination of the Agreement, for any reason other than a breach and default by DuPont, Supplier shall only be entitled to payment for Services properly performed in accordance with the Agreement prior to the effective date of termination.

### 38.  Force Majeure.
If, and to the extent, that performance by a Party (the **"Affected Party"**) of any of its obligations under the Agreement is prevented, hindered or delayed by fire, flood, earthquakes, other elements of nature or acts of God, acts of war, terrorism, riots, rebellions or revolutions, civil disorders or third party labor strikes or disputes (excluding those involving a Party's agents or other contractors) (each a **"Force Majeure Event"**), then the Affected Party shall be excused for such non-performance, hindrance or delay for as long as such Force Majeure Event continues; provided, however:  (1) such Force Majeure Event is beyond the reasonable control of the Affected Party and could not be prevented by reasonable precautions; and (2) the Affected Party is diligently attempting to recommence performance (including through alternate means).  The Affected Party shall immediately notify the other Party of the occurrence of the Force Majeure Event and describe the Force Majeure Event in reasonable detail.  If the Affected Party does not remove or work around the Force Majeure Event within fifteen (15) days, then DuPont (if Supplier is the Affected Party) or Supplier (if DuPont is the Affected Party) may terminate the Agreement (or affected portion) as of the date (including immediately) specified by such Party in a termination notice to the affected Party.

### 39.  Applicable Law and Jurisdiction.
The Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware without giving effect to the principles of conflicts of law.  The Agreement shall not be governed by the U.N. Convention on Contracts for the International Sale of Goods. The Parties consent and submit exclusively to the jurisdiction and service of process of the courts of the State of Delaware or the courts of the United States located in Delaware.

### 40.  Separate Contracts.
DuPont reserves the right to enter into other agreements in connection with the Services. Supplier shall afford other contractors and DuPont reasonable opportunity for introducing and storing their materials and equipment and for performing their services. Supplier shall properly cooperate, connect and coordinate the performance of the Services with

- DuPont Confidential -

General Service Conditions
Copyright © 2005 E. I. du Pont de Nemours and Company.  All rights reserved.

that of other services as shall be in the best interest of the project as determined by DuPont.

#### 41.  Severability.
In the event that any Section of the Agreement shall be found to be void or unenforceable, such findings shall not be construed to render any other Section of the Agreement either void or unenforceable, and all other sections shall remain in full force and effect unless the Section(s) which is/are invalid or unenforceable shall substantially affect the rights or obligations granted to or undertaken by either Party.

#### 42.  Reservation of Rights.
Either Party's waiver of any of its remedies afforded hereunder or by law is without prejudice and shall not operate to waive any other remedies either Party shall have available to it, nor shall such waiver operate to waive either Party's rights to any remedies due to a future breach, whether of a like or different character. Furthermore, any termination of the Agreement shall not relieve or release either Party hereto from any rights, liabilities, or obligations, which it has accrued under law or under the terms of the Agreement prior to the date of such termination.

#### 43.  Publicity and Corporate Identity.
Supplier shall not use the name, tradename, oval, trademarks, service marks or logos of DuPont (DuPont Trademarks) in any publicity releases, news releases, annual reports, product packaging, signage, stationery, print literature, advertising or websites without securing the prior written consent of DuPont Sourcing & Logistics. Supplier shall not, without prior written consent of DuPont, represent, directly or indirectly, that any product or service offered by Supplier, has been approved or endorsed by DuPont. Any DuPont Trademarks that Supplier is given consent to use must always be reproduced distinctively, accurately and consistently and as specified by DuPont. DuPont reserves the right to review and provide final approval of any material produced with approved use of the DuPont Trademarks.

#### 44.  Contract Administrator.
The Contract Administrator will represent DuPont in the administrative phases of the Services. The Contract Administrator shall maintain an interface with Supplier and shall keep the procurement personnel of DuPont informed at all times of the adequacy of Supplier's performance and progress. In the performance of this assignment, the Contract Administrator shall have no legal right to authorize changes of any kind that are outside the scope and compensation of the Agreement, nor shall the Contract Administrator's actions be construed as giving implied approval of any such change. Except as otherwise specifically provided herein, such changes shall be effected only by a written modification to the Agreement. The DuPont and Supplier Contract Administrators for the Agreement are set forth in the Agreement

#### 45.  Notices.
All notices and consents required under the Agreement shall be in writing or by facsimile machine confirmed in writing by the next business day. Written notices shall be effective if delivered by hand to the Party entitled to receive the same, or if sent by registered or certified mail, postage prepaid, or by confirmed courier to such Party at the address stated in the Agreement for the receipt of notices or at such other address as directed by written notice hereunder from time to time; and if no such address is stated or directed, if addressed to such Party at the address stated in the Agreement as being the address of such Party. If a provision in the Agreement requires notice within a stated number of

days, such days shall be calendar days unless business days are specified.

Notices, invoices and other correspondence, information, documentation or payment shall be made and provided as set forth in the Agreement. Either Party may change its address for notice hereunder upon no less than thirty (30) days prior written notice thereof to the other Party.

#### 46.  Alternate Dispute Resolution.
(a)  Both Parties understand and appreciate that their long term mutual interests will be best served by affecting a rapid and fair resolution of any claims or disputes that may arise out of the Agreement. Therefore, both Parties agree to use their commercially reasonable efforts to resolve all such disputes as rapidly as possible on a fair and equitable basis. Toward this end both Parties agree to develop and follow a process for presenting, rapidly assessing, and settling claims on a fair and equitable basis. If any dispute or claim arising under the Agreement cannot be readily resolved by the Parties pursuant to the process referenced in this subsection (a), the Parties agree to refer the matter to a panel consisting of one (1) executive, from each Party, not directly involved in the claim or dispute for review or resolution. A copy of the contract terms, agreed upon facts (and areas of disagreement) and concise summary of the basis for each side's contentions will be provided to both executives who shall review the same, confer and attempt to reach a mutual resolution of the issue.

(b)  If the dispute cannot be resolved under the process set forth in subsection (a), the Parties may elect to resolve the dispute through non-binding mediation. If mediation is to be utilized, the Parties shall select a single unrelated but qualified mediator who shall hold a hearing (not to exceed one (1) day) during which each Party shall present its version of the facts (supported, if desired, by sworn, written testimony, and other relevant documents), its assessment of damages and its argument. The Parties shall provide the mediator with a copy of the Agreement and copies of all documents provided to their executives under subsection (a) at least ten (10) days prior to the scheduled date of the mediation hearing. The Parties may also provide the mediator with copies of any laws or regulations that they feel are relevant to the dispute. Formal written arguments, legal memoranda and live testimony are discouraged but may be permitted at the discretion of the mediator. Both Parties agree to use commercially reasonable efforts, make any involved employees or documents available to the other Party for its review and use in preparing its position under this Section without the need for subpoena or other court order.

(c)  The mediator, within fifteen (15) days of the completion of the hearing, will meet with both Parties and provide each of them, on a confidential basis, with his written views of the strengths and weaknesses of their respective positions. The Parties will then reconvene and, with the assistance of the mediator, attempt to resolve the matter. If resolution cannot be achieved by the Parties within forty-eight (48) hours of this second meeting, the mediator, within fifteen (15) additional days, will issue a written, nonbinding decision on the issue.

(d)  If the matter has not been resolved utilizing the processes set forth in this Section and the Parties are unwilling to accept the nonbinding decision of the mediator, either or both Parties may elect to pursue resolution through litigation.

- DuPont Confidential -

General Service Conditions
Copyright © 2005 E. I. du Pont de Nemours and Company. All rights reserved.

(e) The costs of the mediator shall be borne by the losing Party (determined at mediation or through subsequent litigation). Each Party will bear its own additional costs of mediation.

(f) If a settlement is reached in a case in which joint liability is alleged, the Parties, subsequent to settlement, shall utilize this Alternate Dispute Resolution procedure to determine the proportion of relative fault.

### 47. Privacy.
Supplier shall comply with all aspects of the DuPont Privacy Policy as set forth at http://www.dupont.com/corp/global_privacy.html (or any subsequent site from time to time designated in writing by DuPont), including the execution of the DuPont form Personal Information Transfer Agreement, if applicable, as reasonably determined by DuPont. Unless agreed otherwise in writing, any personally identifiable information provided by one (1) Party to the other hereunder may only be used for conducting the business transaction(s) that is the subject of the Agreement. DuPont does not consent to Supplier's use of any personally identifiable information provided by DuPont, its subcontractor, affiliate, customer, vendor, or employee, for any direct marketing, nor to the transfer of such information to any third party.

### 48. Buy DuPont.
It is DuPont policy to preferentially purchase DuPont products, components, ingredients, services, and technology. In fulfilling the Agreement and in support of the above stated policy, Supplier shall use its best efforts to furnish or specify products that, to the fullest extent possible, incorporate materials manufactured by DuPont, if such materials are suitable for the use intended.

### 49. Changes.
(a) DuPont, by written direction, may make changes in the Services, which shall be performed under the applicable conditions of the Agreement. Such changes may include (i) addition to or deletion of any part of the Services, including increase or decrease of quantities of Services and addition of new Services, (ii) alteration of specifications and/or design, (iii) alteration of DuPont-provided facilities, equipment, materials, services or sites, or (iv) orders for Supplier to accelerate or delay the performance of Services.

(b) All changes in Services must be authorized in writing by DuPont before such Service is begun.

(c) If DuPont and Supplier are unable to agree that an item of Service constitutes a change, or that Supplier is entitled to additional compensation and/or an extension of time for such item of Service, Supplier, upon receipt of a written order signed by DuPont, shall promptly proceed with, and expeditiously perform and/or supply, the item of Service, and shall submit a claim therefore as provided herein below.

(d) In the event DuPont orders completion of Services being provided on a lump sum basis to be delayed or accelerated, adjustment of Supplier's compensation shall be determined by mutual agreement of the Parties based on Supplier's submission of a written estimate of the cost of the delay or acceleration. DuPont reserves the right, however, to reimburse Supplier for delays on an actual cost basis, in which case Supplier shall document such delays daily. Daily documentation shall include identification of the activities, type and number of workers, and type and quantities of materials and equipment affected by the delay.

(e) Supplier shall provide, with its price proposal for all proposed changes in Services, such supporting documentation as DuPont may require to evaluate the proposal.

(f) If the Parties are unable to agree on the amount by which the total amount of the Agreement should be adjusted for a change in Services, DuPont shall provide written notification to Supplier of the adjustment DuPont considers appropriate therefore, and such adjustment shall be effective subject to Supplier's right to submit a claim as provided herein below.

(g) Any claim by Supplier for an adjustment of its compensation or schedule, or in opposition to an adjustment imposed by DuPont through notice as provided herein above, shall be submitted to DuPont in writing by Supplier within fifteen (15) days of commencement of the event giving rise to such claim, or in the case of an adjustment imposed by DuPont through notice as provided herein above, within fifteen (15) days of Supplier's receipt of such notice. Supplier shall submit to DuPont, in writing, the amount or extent of the claim with supporting data within sixty (60) days of completion of the Services or termination of the event for which it claims an adjustment of its compensation or schedule (unless DuPont allows additional time for Supplier to obtain more accurate cost or other data). Such claim shall be resolved through dispute resolution as provided in the Alternate Dispute Resolution Section hereof. No claim by Supplier shall be valid unless submitted in accordance with this Section.

Copyright © 2005 E. I. du Pont de Nemours and Company. All rights reserved.

# EXHIBIT B



Mechanical Integrity

# Non-Destructive Testing Report

Guided Wave Inspection
(Long Range Ultrasonics)

Inspection of Road Crossings
**For**

E.I. DuPont
Louisville Facility

Reported By: Mike Walker
Inspection start March 31, 2004

JOB # 3151A

Phone: 281.540.0314
Fax: 281.540.0317
Mob: 281.543.5636
E-Mail: johnmac@vonl.com

1423 E. First St.
Humble, TX 77338

 **Guided Wave Inspection**

# TABLE OF CONTENTS

EXECUTIVE SUMMARY                                           1.0

SCOPE OF WORK                                               1.1

INSPECTION RESULTS                                         2.0

DESCRIPTION OF EQUIPMENT                                    3.0

*The techniques and procedures applied in this report remain the intellectual property of Mechanical Integrity Inc. The information provided in this report and its attachments are in direct response to the contractual agreement between Mechanical Integrity Inc. and the Client. The Client shall keep confidential all information under or in connection with the Contract and shall not divulge the same to any third party without the written consent of Mechanical Integrity Inc.*

 **Guided Wave Inspection**

## 1.0 Executive Summary

| Unit Location | Kentucky | Pipe Description | Chloroform Line |
|---|---|---|---|
| Plant Location | Louisville | Pipe Diameter | 4.0" |
| Job Representative | Harold Skidmore | Pipe Attitude | Horizontal |
| Inspection Technique | Long Range UT | Pipe Nominal Wall | 0.237" |
| Operating Temperature | Ambient | MI Job # | 3151A |

## 1.1 Scope of Work

Carry out Guided Wave (long range ultrasonic) inspection of 4.0" Chloroform piping under road and rail crossings at DuPont and Rohm and Haas locations.

General Notes: Pictures and drawings are supplied for location information, tests are carried out at many frequencies and analyzed, the identity (ID) and test number (T) stated below should be quoted if any further information on a particular location is required.

 **Guided Wave Inspection**

## 2.0 Inspection Results

| ID | Pipe | Site | Location | Notes | Category |
|----|------|------|----------|-------|----------|
| 1725 | 4.0" | DuPont | T1 jump over −21.8' elbow | North of jump over | Cat 1 |
| 1726 | 4.0" | DuPont | T2 jump over −1.6' elbow | Ring on vertical section | Cat 1 |
| 1731 | 4.0" | DuPont | T3 crossing +18.7' to entrance | South of roadway | Cat1 |
| 1733 | 4.0" | DuPont | T4 crossing −12.0' to entrance | Minor indications see below | Cat 2 |
| 1734 | 4.0" | DuPont | T5 crossing +3.9' | | Cat 1 |
| 1735 | 4.0" | Rohm and Haas | T6 crossing +4.9' to weld | | Cat 1 |
| 1736 | 4.0" | Rohm and Haas | T7 crossing -53.8' to North of crossing | Minor indications see below | Cat 2 |
| 1737 | 4.0" | Rohm and Haas | T8 crossing +1.8' to entrance | | Cat 1 |
| 1738 | 4.0" | Rohm and Haas | T9 crossing +14.8' to elbow | | Cat 1 |
| 1739 | 4.0" | Rohm and Haas | T10 crossing −6.1' to weld | Indications approx. 40% wall loss | Cat 2 |
| 1740 | 4.0" | Rohm and Haas | T11 crossing −8.5' | | Cat 1 |
| 1741 | 4.0" | Rohm and Haas | T12 crossing +2.0' to entrance | Pipe has dog leg under crossing | Cat 1 |
| 1742 | 4.0" | Rohm and Haas | T13 crossing +4.9' to entrance | | Cat 1 |
| 1743 | 4.0" | Rohm and Haas | T14 crossing -6.2' to entrance | | Cat 1 |
| 1747 | 4.0" | Rohm and Haas | T15 crossing −22.6' to entrance | Minor indications see below | Cat 2 |

**Table Key:**

ID:             File ID Number (for use by NDT)
Pipe:       Pipe identification as supplied by customer
Site:           Test Site Name
Location:       Location of test referred to by Test (T) Number
Notes:          Defect indications (defects greater than 20% are also detailed below
                With more information)
Category:Cat 1 = Less than 20% Wall Loss
                Cat 2 = 20% to 50% Wall Loss
                Cat 3 = Greater than 50%

 **Guided Wave Inspection**

TEST LOCATION INFORMATION & LOCATION

Tests 1 & 2





| Tests 1 & 2. | Category 1 |
| --- | --- |
| No Significant areas of Concern | |

 **Guided Wave Inspection**

Tests 3 & 4



CAVERED AREA OF PIPE 8.5 meters WIDE    start of wraping

+ T4

+ T3 = 45°

CROSSING

≈ 20-30% Wall loss around WELD w/external pitting

≅ 10-20% wall loss around WELD w/external pitting

Minor Wall loss, 20-30%



Test 3                                    Test 4

| Tests 3 | Category 1 |
|---------|-----------|
| No Significant areas of Concern | |

| Tests 4 | Category 2 |
|---------|-----------|
| Minor Indications 20 – 30%.  Location:  Elbow weld before entrance. | |



## Guided Wave Inspection

Test 5





| Tests 5 | Category 1 |
|---------|-----------|
| No Significant areas of Concern | |

 **Guided Wave Inspection**

Tests 6 & 7



Minor
Wall loss,
20-30%



T6                                  T7

| Tests 6 | Category 1 |
|---------|-----------|
| No Significant areas of Concern | |

| Tests 7 | Category 2 |
|---------|-----------|
| 20 -30% Wall loss 9.5-10.5' From Entrance | |

 **Guided Wave Inspection**

Tests 8, 9 & 10



Minor Wall loss, 30 - 40%

Minor Wall loss, 30 - 40%



T10                              T8                              T9

| Tests 8 | Category 1 |
|---|---|
| No Significant areas of Concern | |

| Tests 9 | Category 1 |
|---|---|
| No Significant areas of Concern | |

| Tests 10 | Category 2 |
|---|---|
| 30-40% Wall Loss 1 -2m North of Road crossing & 1.5 – 2.0m into roadway (from entrance) | |

 **Guided Wave Inspection**

Tests 11 & 12





T11                                                          T12

| Tests 11 & 12 | Category 1 |
|---|---|
| No Significant areas of Concern | |

 **Guided Wave Inspection**

Tests 13, 14 & 15





Test 13                    Test 14

(No Photograph for Test 15)

 **Guided Wave Inspection**

| Tests 13 | Category 1 |
|---|---|
| No Significant areas of Concern | |

| Tests 14 | Category 1 |
|---|---|
| No Significant areas of Concern | |

| Tests 15 | Category 2 |
|---|---|
| 20 – 30% Wall loss, 11.5-28.9' from entrance | |

Tested & Verified By

M. Walker

Guided Wave Level 2
Certificate No: 004/02

 **Guided Wave Inspection**

## 3.0 Description of Equipment:



**Wavemaker SE16 Pipe screening System**



**Guided Wave Inspection**

# 3:1 General Information  -  Guided Ultrasonic technique

The Wavemaker Pipe Screening System uses guided waves to screen long lengths of pipes for corrosion or cracks. Conventional ultrasonic testing such as thickness gauging uses bulk waves and only tests the region of structure immediately below the transducer. Therefore, it is an extremely slow process to scan a large structure and it is frequently necessary to resort to testing at a grid of points and hoping that they are representative of the whole structure.

However, even this strategy breaks down when part of the structure is inaccessible because it is either buried or covered in insulation. It is much more attractive to be able to screen a large area of structure from a single transducer location, and this is possible using guided waves which propagate along the structure. The Wavemaker system uses special arrays of transducer elements, referred to as rings, which fit around the pipe under test. After a ring has been fitted around a pipe, the operator uses the Wavemaker system to perform a single test that screens a number of meters of pipe on either side of the test location.

The length of pipe that can be effectively screened on either side of the test location in a single test depends on numerous factors and typically ranges from several tens of meters for pipes in good condition down to a few meters for pipes in poor condition or with certain types of coatings. In order to understand how the Wavemaker system works, the whole ring of transducer elements may be regarded as behaving like a conventional ultrasonic transducer operating in pulse-echo mode. The ring sends out a burst of ultrasonic guided waves and then listens to signals that are reflected back.

Figure (a) shows a schematic diagram of the ring of the Wavemaker system operating on a typical pipe that contains an assortment of features around the test location. A schematic of the corresponding results are shown in Figure (b).





# Guided Wave Inspection



The Wavemaker system is composed of three primary components, labelled in Figure (a) as the transducer ring, the Wavemaker SE16 instrument, and the controlling computer. The transducer rings are specific to a certain pipe size. They use either springs or air pressure to dry couple piezoelectric transducer elements to the pipe being inspected. Internal circuitry allows each transducer ring (and therefore the diameter of the pipe being tested) to be automatically detected by the electronics. All of the signal generation and detection is housed in the Wavemaker SE16 instrument, which operates from an internal rechargeable battery and is connected to a standard laptop PC via a USB or serial connection. The control of the instrument as well as the signal processing and report sheet generation is done via the Wavemaker WavePro software.

 **Guided Wave Inspection**

## 3.2   How the test is performed

### A. EQUIPMENT PREPARATIONS PRIOR TO INSPECTION

The configuration of the equipment and the choice of transducer rings varies depending on such features as the pipe diameter, pipe condition, coatings, type of supports, and suspected type of defect. In order to obtain optimum results, it is made a checklist that the GUL operator will complete in co-operation with the customers on a site visit. The checklist is found in appendix A. If available, isometric drawings are very helpful, especially for reporting the location of suspected corrosion.

### B. PIPELINE PREPARATIONS PRIOR TO INSPECTION

In general very little surface preparation is required for testing using this technique because the operating frequency is quite low. The transducers are able to couple directly through paint, thin layers of epoxy, or a small amount of general corrosion. However, if there is any flaking paint or corrosion, this should be scrapped off. In addition, if there is any thick (greater than 1mm) coating, this needs to be removed over an area 300 mm long.

In order to inspect the pipelines that are insulated, the insulation must be removed over a small area, which is typically one meter long. The areas where the insulation should be removed is usually marked on the pipe by GUL operators at a site visit. The transducer rings must be able to contact the pipe wall around the entire circumference of the pipe. Therefore, any heat tracing or wire that is attached to the pipe should be released, leaving a minimum of 200mm between the pipe wall and the wire.

### C. SURVEY SCHEDULE

The time that it will take to inspect a section of pipe varies depending on the number of features present and accuracy desired. Typically, at the beginning of an inspection job, a couple of hours are spent setting up the equipment and configuring it for the locally experienced conditions. Once this configuration is established, it typically takes an hour to test at 3 to 4 positions if access is good and the pipe does not have many features. If suspected corrosion is found, the area is usually examined at additional frequencies and from both sides of the suspect area. This process is used to try to better classify the extent of the corrosion and can take up to an hour.

### D. CONFIGURATION OF TEST PARAMETERS

The Wavemaker system allows for a wide variety of test parameters to be adjusted. These adjustments are designed to allow the operator to optimise the system depending on the local conditions. Some of the compromises that need to be made include
- should the system try to inspect as close to the transducer rings as possible or as far as possible
- should the sensitivity be increased, which will reduce the distance that can be inspected in each test

All of the parameters (including things such as the frequency of excitation and the shape of the excitation

 **Guided Wave Inspection**

signal) that are used in the used are saved with the data file, so that the exact same test could be repeated at a later date.

# E. REPRODUCIBILITY OF THE TEST RESULT

In general, the Wavemaker system is only sensitive to cross sectional losses greater than 5-10 percent of the cross section of the pipe. However, if an inspection result is compared to a previous result at the same location, changes in cross section much smaller than this level (1-2 percent) can be detected. In order use the system to track suspect areas, the Wavemaker automatically saves the tests configuration as well as information about the identified features. The software also stores manually entered information about the location where the test was performed. With this information, current results can be compared to future ones to look for changes. The file size for each test position (which inspects many meters) is usually well less than a megabyte, so the information can be relatively easily archived and provided to the plant operator.

# F. INTERPRETATION OF THE RESULTS

The interpretation of the results is the most difficult part of using guided ultrasonic waves to screen pipes. In order to evaluate the features that are present in the trace, various tools/techniques are available to the operator of the system. These include:
*   Common sense – What one expects to find
*   Visual inspection – What one saw
*   Reflected amplitude (as related to the Distance Amplitude Correction curves)
*   Symmetric /non symmetric nature of a reflection
*   Phase of reflection
*   Orientation of reflection
*   Behaviour at different frequencies
*   Manual measurement to visual confirmed known echo reflections – support, weld.
*   Reverberations that cause phantom echo

Using these tools, a well-trained operator can classify the source of observed reflections. However, this technique is a screening tool that can not be used to give precise 'sizing' of defects or accurate estimations of remaining wall thickness.

 **Guided Wave Inspection**

## 3.3    Equipment Capabilities

| | |
|---|---|
| Pipe sizes | 2 to 36 inch inclusive |
| Wall thickness | 1 to 40 mm |
| Couplant | None |
| Surface preparation | Remove flaking paint / corrosion |
| Material | Metal |
| Temperature range of pipe while inspected | -20 to 120 Celsius |
| Pipe isolation requirements | None |
| Maximum effective test range (the farthest distance that can be inspected) | Max 80 meters on either side of ring (typical 10-30 meters depending on pipe coatings and condition) |
| Minimum effective test range (the nearest distance that can be inspected) | 0.75 meters |
| Coverage | 100% within diagnostic length |
| Sensitivity | Typically, 5-10 % cross sectional area change |
| Pipe contents | Has little effect |
| Frequency range of electronics | 5 - 150 kHz |
| Frequency range of standard transducer elements | 20-55 kHz |
| Digitisers | Up to 64000 points at 12 bit resolution sampled at 1 MHz |
| Digital averaging | Up to 64000 averages |
| Gain range | 20-80 dB |
| Analog Filters (switchable) | 0.4,2,10 kHz high pass 20,40,80,160 kHz low pass |
| Number of transducer channels | 16 |
| Maximum output drive voltage (limited to a 6 ms output burst every 80 ms) | 100 Vpp (35 V rms) |
| Output waveform shape | Arbitrary function generator |
| Communication options | USB and RS232 |

 **Guided Wave Inspection**

The report sheet is divided into several sections, including:

**Location and Configuration**: This section records where and how the test was performed so that the same configuration can be used to track changes over time.

**General Notes**: These contain notes that the operator has entered and usually summarise the results at that test location.

**Notes on Specific Features**: For each feature that the operator has identified as significant, a line is added to the feature table. The labels in the first column can be used to match up this information to echoes in the response that is shown below, from which the location and size columns are taken. If the feature is identified as possible corrosion, the 'ECL' column represents the Estimated Cross-sectional Loss (displayed in percent) that the operator has calculated. This estimation, which is described in more detail later, is very approximate and is mainly used to help with the classification of the severity of the defect, which is shown in the 'Class' column.

**Schematic of Features**: All of the features that are identified from the results (or possibly identified visually in the case of penetrations, supports, drains, etc.) are represented in a small schematic drawing, like the one shown below:



 **Guided Wave Inspection**

**View of Processed Data:** There is a trace on the bottom of the report sheet, which is similar to an A-scan and displays the processed data. At each change in cross section (or impedance) there is a reflection of the ultrasonic energy that appears as a peak in the trace. In order to help the classification of the observed echoes, DAC curves are shown as dotted lines. In addition, there are two traces shown on the graph, one black and one red. The black trace represents echoes from features that are symmetric around the circumference of the pipe (such as welds and flanges) and the red line represents echoes from non-axi-symmetric features such as corrosion and supports. The ratio of the red and black traces can be used to approximate the circumferential extent of the observed feature. This information is used in conjunction with the Estimated Cross-sectional Loss (ECL) to classify the type of feature (and its severity if it is corrosion). For example, the three following pictures all represent about 10 percent of the cross sectional area (as seen through the total wall of the pipe), however, the scenario on the left (where the loss is concentrated in one area) is far more serious than the one on the right. The ratio of red to black allows the determination of this distribution of loss.



# EXHIBIT C

**DUPONT**

**E. I. du Pont de Nemours and Company**
WILMINGTON, DE 19898 U.S.A.

MECHANICAL INTEGRITY INC
1423 E FIRST ST
HUMBLE TX   77338

| Purchase order |
|---|
| PO number/date |
| 4500405916 / 03 Nov 2005 |
| Contact person/Telephone |
| Fields, Kathy/502 775-3013 |
| Our fax number |
| 502 775-3032 |
| |
| Your person responsible |
| Justin Lecourias |

Your vendor number with us
8015960

Please enter our order as specified below subject to terms and conditions
listed on both the face and/or reverse side of this purchase order. Any
additional or different terms in seller's form(s) are material alterations and
are hereby rejected.
1. If price, terms, and required receiving date or other conditions and instructions
are not acceptable immediately advise buyer shown below.
2. Furnish complete shipping information and include 2 copies of packing list
with each shipment.  Show purchase order number / release number on each
package, packing list, invoice, bill of lading, and all correspondence.

Please deliver to:                    Delivery date:     27 Oct 2005
LOUISVILLE WORKS MFGG 2350 C5
4131
4200 CAMP GROUND RD.
LOUISVILLE KY  40216-4602

Mail your invoice to address indicated below:
E I DuPont de Nemours and Co., Inc.
Nashville Payment Center
P.O.Box 367
Old Hickory, TN 37138-0367

Terms of deliv.: 000 - Delivery terms do not apply
Terms of payt.:    Net 60 days from date of invoice
Currency:          USD

Please ignore the address above and mail invoices to the Louisville
address listed below.  Should you have any questions, contact Kathy
Fields 502-775-3013.
**************************************************************
For On-Site Contracted Services and Off-Site Repair Services send
invoices to:
DuPont Louisville Works
Attn:  Kari Joplin
P.O. Box 16350
Louisville, KY 40256
**************************************************************
Attachements:  Site Conditions dated July 26, 2005 and General Terms
and Conditions dated Feb. 7, 2005

Send Collect freight invoices for US domestic orders to:
DuPont c/o Cass Information Systems
PO Box 17606
St Louis, MO 63178-7606

**DUPONT®**

E.I. du Pont de Nemours and Company

WILMINGTON, DE 19898 U.S.A

| | | |
|---|---|---|
| MECHANICAL INTEGRITY INC<br>1423 E FIRST ST<br>HUMBLE TX 77338 | PO number/date<br>4500405916 / 03 Nov 2005 | Page<br>2 / 2 |

| Item | Material<br>Order qty. | Unit | Description<br>Price per unit | Net value |
|---|---|---|---|---|
| 00010 | | | OUTSIDE INSPECTION OF CHCL3 HEADER | |
| | 1.000 | Perf Unit | 14,000.00 | 14,000.00 |

OUTSIDE INSPECTION OF CHCL3 HEADER
THIS IS TO BE DONE BY OUTSIDE VENDOR. THE VENDOR OF RECORD IS
GUIDED ULTRASONICS. I WILL FAX YOU THEIR QUOTE TO HAROLD
SKIDMORE. IF YOU NEED MORE INFORMATION PLEASE CONTACT HAROLD AT
3286.
THE PRICE OF $12,935 IS TO INCLUDE LABOR/EQUIPMENT CHARGES AND
EXCLUDES AIRFARE AND FREIGHT.
THIS WORK IS TO BE SCHEDULED DURING DPE OUTAGE SOMETIME AROUND
THE 14TH OF NOV. PER HAROLD.
Expected value of unplanned services:        14,000.00

Total net item value excluding tax USD        14,000.00

JS 44  (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

E. I. DUPONT DE NEMOURS AND COMPANY,

## DEFENDANTS

MECHANICAL INTEGRITY, INC.

**(b)** County of Residence of First Listed Plaintiff  New Castle County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Kathleen Furey McDonough (I.D. #2395) (302) 984-6000
Sarah E. DiLuzio, (I.D. #4085)
Potter Anderson & Corroon LLP, P. O. Box 951
Wilmington, DE  19801

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [x] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [x] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [x] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [x] 190 Other Contract
- [ ] 195 Contract Product Liability

### TORTS
**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury

**PERSONAL INJURY**
- [ ] 362 Personal Injury— Med. Malpractice
- [ ] 365 Personal Injury — Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### CIVIL RIGHTS
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 444 Welfare
- [ ] 440 Other Civil Rights

### PRISONER PETITIONS
- [ ] 510 Motions to Vacate Sentence
  **Habeas Corpus:**
- [ ] 530 General
- [ ] 535 Death Penalty
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition

### FORFEITURE/PENALTY
- [ ] 610 Agriculture
- [ ] 620 Other Food & Drug
- [ ] 625 Drug Related Seizure of Property 21 USC
- [ ] 630 Liquor Laws
- [ ] 640 R.R. & Truck
- [ ] 650 Airline Regs.
- [ ] 660 Occupational Safety/Health
- [ ] 690 Other

### LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Mgmt. Relations
- [ ] 730 Labor/Mgmt.Reporting & Disclosure Act
- [ ] 740 Railway Labor Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 840 Trademark

### SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

### FEDERAL TAX SUITS
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce/ICC Rates/etc.
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 810 Selective Service
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 875 Customer Challenge 12 USC 3410
- [ ] 891 Agricultural Acts
- [ ] 892 Economic Stabilization Act
- [ ] 893 Environmental Matters
- [ ] 894 Energy Allocation Act
- [ ] 895 Freedom of Information Act
- [ ] 900 Appeal of Fee Determination Under Equal Access to Justice
- [ ] 950 Constitutionality of State Statutes
- [ ] 890 Other Statutory Actions

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Action for breach of contract, misrepresentation and fraud.  Jurisdiction exists pursuant to 28 U.S.C. Section 1332.

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ $2,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
(See instructions):

JUDGE _____  DOCKET NUMBER _____

DATE  6/1/07

SIGNATURE OF ATTORNEY OF RECORD  *Sarah E. DiLuzio*

## FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

JS 44 Reverse (Rev. 12/96)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44

## Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.**     **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b.) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**     **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States, are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.**     **Residence (citizenship) of Principal Parties.** This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**     **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.**     **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a) Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.**     **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause.

**VII.**     **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**     **Related Cases.** This section of the JS-44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____ 0 7 - 3 4 6 _____

# ACKNOWLEDGMENT
# OF RECEIPT FOR AO FORM 85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____ 2 _____ COPIES OF AO FORM 85.

JUN 0 1 2007
_____
(Date forms issued)

_____
(Signature of Party or their Representative)

_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action