IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| E.I. DU PONT DE NEMOURS AND COMPANY, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No.: 07-346 SLR |
| | ) | |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| MECHANICAL INTEGRITY, INC., | ) | |
| | ) | |
| Defendant/Third Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MIKE WALKER AND NDT EQUIPMENT SERVICES LTD., | ) | |
| | ) | |
| | ) | |
| Third Party Defendant. | ) | |

## MECHANICAL INTEGRITY INC.'S OPENING BRIEF IN RESPONSE TO NDT'S EQUIPMENT SERVICES LTD. AND MIKE WALKER'S MOTION TO DISMISS THIRD PARTY COMPLAINT

REGER RIZZO & DARNALL LLP

*/s/ Louis J. Rizzo, Jr., Esquire*
Louis J. Rizzo, Jr., Esquire
Delaware State Bar I.D. No. 3374
1001 Jefferson Plaza, Suite 202
Wilmington, DE 19801
(302) 652-3611
Attorney for Defendant/Third Party Plaintiff
Mechanical Integrity, Inc.

Dated: March 5, 2008

## <u>TABLE OF CONTENTS</u>

<u>Pages</u>

TABLE OF AUTHORITIES.................................................................................. ii, iii

I.      STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS.    1

II.     SUMMARY OF ARGUMENT........................................................................    3

III.    STATEMENT OF FACTS..............................................................................    3

IV.     ARGUMENT...................................................................................................    5

        A.      ANY AND ALL ARGUMENTS RELATING TO THIRD
                PARTY DEFENDANT WALKER AS AN INDIVIDUAL IS
                MOOT. ..................................................................................................    5

        B.      DELAWARE HAS JURISDICTION OVER NDT...........................    6

                1.      NDT is bound by the forum selection clause because
                        they are closely related to the contract and the claims
                        arise from such contract.............................................    7

                        a.      The Forum Selection Clause is valid..................... 8

                        b.      NDT is closely related to the Contract....................    9

                        c.      The claims arise from their standing
                                to the Contract.........................................................    10

                2.      NDT should be equitably estopped from denying
                        jurisdiction...................................................................    10

        B.      THE THIRD PARTY COMPLAINT HAS BEEN PROPERLY
                SERVED................................................................................................    11

V. CONCLUSION.............................................................................................    13

## TABLE OF AUTHORITIES

**Pages**

**Federal Cases**

*Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*,
　　170 F.3d 349 (3d Cir. 1999)..................................................　10

*Bell Helicopter Textron, Inc. v. C & C Helicopter Sales, Inc.*,
　　295 F. Supp. 2d 400 (D. Del. 2002)............................................ 6

*Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*,
　　709 F.2d 190 (3d Cir. 1983)................................................... 7

*E.I. Dupont de Nemours & Co. v. Rhone Poulenc Fiber & Resin*
　　*Intermediates, S.A.S.*, 269 D.3d 187 (3d Cir. 2001)..........................　10

*Hadley v. Shaffer*, 2003 *U.S. Dist. LEXIS* 14106,
　　(D. Del. Aug. 12, 2003).................................................　7, 9

*Jeffreys v. Exten*, 784 F. Supp. 146 (D. Del. 1992)............................. 6

*Jordan v. SEI Corp.*, 1996 *U.S. Dist. LEXIS* 7627,
　　(E.D. Pa. June 4, 1996)...................................................　9

*Lauro Lines v. Chasser*, 490 U.S. 495 (1989)................................... 7

*M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972).................... 7

*Omni Capital Int'l Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97,
　　(1987)...................................................................　11

*Physician Endorsed LLC v. Clark*, 374 F. Supp. 2d 395 (*D. Del. 2005*)................ 6, 10

*Process and Storage Vessels, Inc., v. Tank Servs., Inc.*,
　　541 F.Supp. 725 (D. Del. 1982)............................................　8

*Res. Ventures, Inc. v. Res. Mgmt Int'l, Inc.*, 42 F. Supp. 2d 423
　　D. Del. 1999)............................................................　7

**State Cases**

*Capital Group Cos. v. Armour*, 2004 *Del. Ch. LEXIS* 159,
　　(Del. Ch. Oct. 29, 2004).................................................　7, 10

**Pages**

*Coston v. Brown*, 2004 *Del. Super. LEXIS* 345 at *3
    (Del. Super. Ct. Sept. 10, 2004)................................................... 12

*Harmon v. Eudaily*, 420 A.2d 1175 (Del. 1980).................................... 6

*Hart Holding Co., Inc. v. Drexel Burnham Lamber, Inc.*,
    593 A.2d 535 (Del. Ch. 1991)...................................................... 6

*Quinn v. Keinicke*, 700 A.2d 147 (Del. Super. 1996)................................... 12

*Sternberg v. O'Neil*, 550 A.2d 1105  (Del. 1987)............................... 7

*Waters v. Deultz Corp.*, 460 A.2d 1332 (Del. Super. 1983).................................. 6

**Statutes**

10 *Del.C.* § 3104....................................................................... 1,2,3,6
    ,12

10 *Del.C.* § 3112....................................................................... 2

Convention of the Service Abroad of Judicial and Extrajudicial Documents
    in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T361................... 11,12

**Other Authorities**

Federal Rules of Civil Procedure Rule 4.............................................. 12,13

COMES NOW, Defendant/Third Party Plaintiff, Mechanical Integrity Inc., through its counsel, respectfully moves this Court to DENY Third Party Defendants NDT Equipment Services LTD. and Mike Walker's Motion to Dismiss the Third Party Complaint.  In support of its Motion, Defendant avers the following:

## I.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

On or about June 1, 2007, E.I. du Pont Nemours and Company (herein after referred to as "DuPont") filed a suit against Mechanical Integrity alleging that they breached the contract, and committed fraud, intentional misrepresentation, and/or negligent misrepresentation.  See D.I. 1. DuPont alleged upon reliance of Mechanical Integrity's report, essentially NDT's report, they suffered damages due to not being able to repair the area of the pipe where the leak occurred. See D.I. 1.

On or about October 1, 2007, Mechanical Integrity filed a Motion for Leave to File a Third Party Complaint against NDT Equipment Services LTD. (hereinafter referred to as "NDT") and Mike Walker individually. See D.I. 16.  On or about October 19, 2007, the Court granted leave to Mechanical Integrity to File the Third Party Complaint. See D.I.20.

Mechanical Integrity has attempted to complete service upon Third Party Defendant in three different ways: 1) request for waiver of service, 2) long arm statute, and 3) through the Hague Convention. As stated in Third Party Defendants' Motion to Dismiss, both Walker and NDT have received such request for waiver of service and have refused such service.  See D.I. 29 at page 4.

As prescribed by 10 Del. C. § 3104 and specifically within 7 days of return of service from the Secretary of State, Mechanical Integrity sent NDT and Walker, respectively, via registered mail,

a copy of the process and complaint served upon the Secretary of the State and the statement that service of the original such process has been made upon the Secretary of the State, and that under this section such service is effectual to all intents and purposes as if it had been made upon them personally within the State. See Rizzo letter, attached hereto as Exhibit "A". It is not disputed by NDT that Mechanical Integrity sent the registered mail to NDT and Walker within 7 days as prescribed by statute. See D.I. 29 at page 15, stating that return of service was filed on December 10, 2007 and Mechanical Integrity sent the notices via registered mail on December 14, 2007. Due to a typographical error, the letter states that service has been performed under 10 Del. C. § 3112 rather than § 3104 but has all other necessary language within the letter. See Exhibit "A". Obviously Third Party Defendants received such notice as it was mentioned in their Motion to Dismiss. See D.I. 29, page 4.

As to the Hague service, on or about December 6, 2007, six copies of the Complaint and Request for Service Abroad of Judicial or Extrajudicial Documents were sent to England's Central Authority for service on NDT. See Gumapac Letter, attached hereto as Exhibit "B". Upon a conversation with the Queens Bench Division, the United Kingdom authorities responsible for service through the Hague Convention is still in the process of serving the named Third Defendants. See affidavit of Rochelle Gumapac, Esq., attached hereto as Exhibit "C". The Queens Bench, the England's designated central authority, confirmed that once service is completed, it will file the receipt of service directly to the District Court of Delaware. See Exhibit "C".

Third Party Plaintiff offered to voluntarily dismiss Walker as a party upon written confirmation that all actions taken in relation to this matter were performed in his capacity as agent of NDT and not in his individual capacity. On January 30, 2008, Third Party Plaintiff received written

2

confirmation. See Rostocki Letter, attached here to as Exhibit "D". On February 1, 2008, Third Party Plaintiff voluntarily dismissed Mike Walker. See D.I. 27.

Later that same day, NDT and Mike Walker filed a Motion to Dismiss and an Opening Brief in Support of Motion to Dismiss. See D.I. 28 & 29.

## II.    SUMMARY OF ARGUMENT

### A.    ANY AND ALL ARGUMENTS RELATING TO THIRD PARTY DEFENDANT WALKER AS AN INDIVIDUAL IS MOOT.

Prior to the filing of NDT and Mike Walker's Motion to Dismiss, Mike Walker was voluntarily dismissed therefore making any arguments regarding Mike Walker moot.

### B.    DELAWARE HAS JURISDICTION OVER NDT.

NDT is bound by the valid forum selection clause selecting Delaware jurisdiction because they are closely related to the contract and the claims arise from such contract. Alternatively, NDT should be equitably estopped from denying jurisdiction because they directly benefitted from the DuPont and Mechanical Integrity contract.

### C.    NDT HAS BEEN PROPERLY SERVED.

NDT has been properly served through Delaware's Long Arm Statute, 10 *Del. C.* § 3104, and is pending additional proper service through the Hague Convention.

## III. STATEMENT OF FACTS

On or about February 2, 2004, DuPont and Mechanical Integrity Inc. entered into a contract, Purchase Order No. 4500104098, whereby Mechanical Integrity was to perform a "guided wave" ultrasound inspection on DuPont's chloroform pipeline supplying their Louisville, Kentucky plant. See Purchase Order, attached hereto as Exhibit "E". The Purchase Order expressly incorporates

DuPont's General Conditions. See General Conditions, originally attached to the Purchase Order, attached hereto as Exhibit "F". The parties' contract contained a forum selection clause, whereby signing the contract, Mechanical Integrity consented and submitted exclusively to the jurisdiction and service of process of the courts of the State of Delaware or to the courts of the United States located in Delaware. See Exhibits "E", "F", and D.I. 1.

Because of the sophistication and relative newness of the technology needed to perform a "guided wave" ultrasound inspection, Mechanical Integrity orally contracted with NDT Services LTD., specifically through NDT's agent and/or director Mike Walker, to perform the DuPont inspection. See Mike Sens' Affidavit, attached hereto as Exhibit "G". NDT and/or Mike Walker, as a director and/or agent of NDT, had previous contractual relationships with Mechanical Integrity. See Exhibit "G". All contractual agreements between Mechanical Integrity and NDT were undertaken by Mechanical Integrity's late founder, John McMillian. See Exhibit "G". It is unknown whether NDT and/or Mike Walker, as a director and/or employee of NDT, was ever given a copy of the contract between DuPont and Mechanical Integrity. See Exhibit "G". In fact at the time of the inspection, Mechanical Integrity believed that NDT Services LTD was one of the highest recommended companies in the world performing such "guided wave" ultra sound inspection on a regular basis. See Exhibit "G".

On or about March 31, 2004 to April 1, 2004, an inspection of the chloroform pipeline was conducted at the DuPont Louisville plant. See D.I. 1. Mike Walker performed the actual "guided wave" ultra sound inspection. See Exhibit "G". Mike Walker was being assisted by Mechanical Integrity employee Mike Sens while DuPont employees and/or agents observed. See Exhibit "G". During the inspection, Walker used his own tools and/or technology and performed all the duties set

4

forth in the Mechanical Integrity and DuPont contract. See Exhibit "G". During the inspection, Mike Walker was unable to deploy the equipment and/or test multiple sections of the pipe due to the pipe being emerged under water and/or off its support. See Exhibit "G".

Shortly after the inspection, Mike Walker, as a director and/or agent of NDT Services LTD., drafted a report containing all his observations and/or recommendations as to the DuPont chloroform pipeline. See NDT's report, attached hereto as Exhibit "H". Mechanical Integrity adopted all of Mike Walker's findings and submitted such findings to DuPont. See Mechanical Integrity's report, attached hereto as Exhibit "I".

Subsequent to the March 31, 2004 to April 1, 2004 inspection, DuPont contracted again with Mechanical Integrity, Purchase Order No. 450045916, to conduct a subsequent inspection of the pipeline. See Purchase Order, attached hereto as Exhibit "J".  The inspection was to be conducted from November 17, 2005 to November 19, 2005. See Plaintiff's Complaint (D.I. 1), paragraph 15. During such inspection on November 18, 2005, a chloroform leak was detected at the DuPont Louisville pipeline near an area designated by DuPont as T9 of the pipeline. See D.I. 1, paragraph 16.

## IV.    ARGUMENT

### A.    ANY AND ALL ARGUMENTS RELATING TO THIRD PARTY DEFENDANT WALKER AS AN INDIVIDUAL IS MOOT.

On or about February 1, 2008, prior to the filing of the Motion to Dismiss, Mechanical Integrity voluntarily dismissed Third Party Defendant Walker in his individual capacity. See D.I. 27. Thus since Third Party Defendant Walker in his individual capacity has already been dismissed, any arguments pertaining to Walker is moot.

### B.    DELAWARE HAS JURISDICTION OVER NDT.

5

When reviewing a Motion to Dismiss based on lack of personal jurisdiction, a Court must accept all of Plaintiff's allegations of jurisdictional fact and resolve all factual disputes in favor of the Plaintiff. *Physician Endorsed LLC v. Clark*, 374 F. Supp. 2d 395 (*D. Del. 2005*). A federal district court can assert personal jurisdiction over a non-resident of the state in which the court sits to the extent authorized by that state's law. *Bell Helicopter Textron, Inc. v. C & C Helicopter Sales, Inc.*, 295 F. Supp. 2d 400 (D. Del. 2002).

It is a two-step process to determine if Delaware has personal jurisdiction over the Defendant; first, the Defendant's asserted conduct must fall within an enumerated category under 10 *Del.C.* § 3104; and second, service must comport with the traditional notions of fair play and substantial justice under the due process clause. *Jeffreys v. Exten*, 784 F. Supp. 146 (D. Del. 1992). Delaware's long arm statute subsection © is to be construed liberally, favoring the exercise of jurisdiction. See *Waters v. Deultz Corp.*, 460 A.2d 1332 (Del. Super. 1983). The Plaintiff having the evidentiary burden in a challenge to personal jurisdiction may not ordinarily be precluded from reasonable discovery in meeting his or her burden. See *Hart Holding Co., Inc. v. Drexel Burnham Lamber, Inc.*, 593 A.2d 535 (Del. Ch. 1991).

When an in personam jurisdiction is challenged, the record is construed most strongly against the moving party. See *Harmon v. Eudaily*, 420 A.2d 1175 (Del. 1980). The Court cannot grant a Motion for Lack of Personal Jurisdiction by simply accepting that the well pleaded facts in the Complaint as true "because the pleader has no obligation to plead facts that show the amenability of the defendant to service of process." *Hart Holding Co. Inc.*, 593 A.2d at 538.

6

1.    NDT is bound by the valid forum selection clause because they are closely
related to the contract and the claims arise from such contract.

A party may expressly consent to jurisdiction by contract. See *Capital Group Cos. v. Armour*, 2004 *Del. Ch. LEXIS* 159, at *2 (Del. Ch. Oct. 29, 2004). When there is a valid forum selection clause in a contract, the parties to the contract are considered having expressly consented to jurisdiction. *Res. Ventures, Inc. v. Res. Mgmt Int'l, Inc.*, 42 F. Supp. 2d 423, 431 (D. Del. 1999). Express consent to jurisdiction, in and of itself, satisfies the requirements of Due Process. See *Sternberg v. O'Neil*, 550 A.2d 1105, 1116 (Del. 1987). Therefore, if consent is found as to personal jurisdiction through contract, no minimum contracts analysis is required. See *Capital Group*, 2004 WL 2521295, at *2. Forum selection clauses and/or consent to jurisdiction clauses are "presumptively valid" and should be "specifically" enforced unless a party can "clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid" for other reasons such as fraud or against public policy. *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972).

In *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190 (3d Cir. 1983), the Court held that Coastal, a non signatory to a contract, was bound by the Farmer Norton and Tilghman contract containing a forum selection clause. *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190 (3d Cir. 1983), overruled on other grounds by *Lauro Lines v. Chasser*, 490 U.S. 495 (1989). In *Coastal*, Coastal had contracted with Farmer Norton and in turn Farmer Norton contracted with Tilghman to fulfill its contract with Coastal. *Id*. The Farmer Norton and Tilghman contract contained a forum selection clause, which was enforced upon the non-signatory party, Coastal. *Id*.

Similarly, in *Hadley v. Shaffer*, 2003 *U.S. Dist. LEXIS* 14106, (D. Del. Aug. 12, 2003), the

7

Court also enforced a forum selection clause upon a non-signatory. *Id*. In coming to its conclusion, the Court followed a three-part inquiry into whether a party who does not sign a contract can be bound by the forum selection clause contained therein. *Id*. The following is the three-part inquiry:

> First, is the forum selection clause valid? Second, are the defendants third party beneficiaries, or closely related to, the contract? Third, does the claim arise from their standing relating to the [merger] agreement?

Id. at *10.

Although NDT was a non-signatory to DuPont and Mechanical Integrity's contract containing a forum selection clause, they should be held as expressly consenting jurisdiction like in *Hadley* and *Coastal*. As in *Hadley*, the forum selection clause is valid, NDT is closely related to the contract, and claim arises from such agreement.

a.    The Forum Selection Clause is valid.

Generally, forum clauses are enforced as long as at the time of litigation, it would not place any parties at a substantial and unfair disadvantage or otherwise deny a litigant his day in court. See *Process and Storage Vessels, Inc., v. Tank Servs., Inc.*, 541 F.Supp. 725, 733 (D. Del. 1982). A forum selection clause is presumptively valid. See *Coastal*, F.2d at 202. In order to make it invalid, the objecting party has to establish "1) that it is the result of fraud or overreaching, 2) that enforcement would violate a strong public policy of the forum, or 3) that enforcement would in the particular circumstances of the case result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable. *Id*. Both Delaware and federal jurisdictions have supported the general principal that private parties can agree to litigate actions arising out of a contract in a single jurisdiction. See *Process*, 541 F.Supp. at 733. Thus "defendant bears a heavy burden in claiming that the forum selection clause is invalid". *Capital Group*, 2004 *Del. Ch. LEXIS* 159 at * 23 (Del. Ch. 2004).

8

In the instant case, there are no facts to support that forum selection clause was due to fraud or overreaching and that the enforcement would violate a strong policy of the forum. Additionally, litigating in Delaware is not so inconvenient when faced with the fact that if this action was dismissed, suit against NDT would be filed in either Texas or Kentucky, where jurisdiction would clearly exist. Should this case be brought elsewhere, NDT would be at a disadvantage since the case would continue in Delaware and NDT would not have an opportunity to actively participate in discovery and would be faced with defending the same suit in another jurisdiction, which would simply result in increased costs and expenses related to coordinating discovery in two related cases. Therefore, the forum selection clause is valid.

    b.  NDT is closely related to the Contract.

Should the defendant be found by the Court as a party, third party beneficiary, or closely related to the contract, they will be bound by the forum selection clause. *Hadley*, 2003 *U.S. Dist. LEXIS* 14106 at \*12. "Forum selection clauses bind nonsignatories that are closely related to the contractual relation or that should have foreseen governance by the clause." Id. at \*18, citing *Jordan v. SEI Corp.*, 1996 *U.S. Dist. LEXIS* 7627, at \*18-19 (E.D. Pa. June 4, 1996).

In the instant case, NDT is closely related to the contractual relation. NDT performed all the obligations under the DuPont and Mechanical Integrity contract and received a direct benefit from the contract, compensation. Additionally, prior to undertaking the inspection, NDT was or at the very least should have been aware that a contractual relationship existed between DuPont and Mechanical Integrity and that their services on behalf of Mechanical Integrity were dictated by such contract. Indeed, NDT performed the inspection enumerated in the DuPont contract, which confirms NDT's familiarity with its terms. Thus NDT was closely related to the contractual relationship and should

9

have foreseen such governance by the clause.

                c.       The claims arise from their standing to the Contract.

In the instant matter, the claim obviously arises from the Contract. The Contract was drafted and directs activities relating to the inspection of DuPont's Kentucky pipeline. The claims of DuPont and subsequent claims from Mechanical Integrity arise from such inspection of DuPont's Kentucky pipeline. NDT performed the actual inspection and directly benefitted from the contract, therefore making the claim arise from the Contract.

In sum, the Court should conclude that NDT is bound by the forum selection clause because the contract contains a valid clause, NDT is closely related to the Contract, and the claim arises from such contract.

                2.       NDT should be equitably estopped from denying jurisdiction.

Should the Court hold that NDT is not bound by the contract, jurisdiction is still proper under the doctrine of equitable estoppel. Non-signatories are prevented from embracing portions of the contract and then turning their back on other portions of the contract, such as a forum selection clause, that they find distasteful through the doctrine of equitable estoppel. *E.I. Dupont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 D.3d 187, 200 (3d Cir. 2001). Generally, the cases applying the doctrine of equitable estoppel in this context involve non-signatories who, despite never signing the contract, embrace the contract during performance and then, during litigation, attempt to discard portions of the contract such as a forum selection or arbitration clause. See *Capital Group*, 2004 Del. Ch. LEXIS 159 at *27, referencing *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (3d Cir. 1999). In *Capital Group*, the Court held that generally a non-signatory should be "estopped from refusing to comply with a forum selection clause

when she receives a "direct benefit" from a contract containing a forum selection clause". *Id*.

In the instant case, NDT embraced the contract between DuPont and Mechanical Integrity by performing all the duties within the Contract and following DuPont's inspection guidelines and cannot now discard the portions of the contract it finds unwanted.

Additionally, NDT received direct benefits from DuPont and Mechanical Integrity's contract. Firstly, NDT received compensation for the inspection. Without such contract, there would have been no reason for Mechanical Integrity to compensate NDT. Secondly, NDT received the benefit of further testing its new ultra sound technology by performing the inspection at DuPont. The inspection gave NDT another chance to use the new technology. Lastly, NDT received an opportunity to strengthen its relationship with Mechanical Integrity and expand its business relations. The contract between DuPont and Mechanical Integrity provided an opportunity for NDT to showcase its new technology and possibly obtain more business in America, which would in turn expand their client base and raise more compensation.

Since NDT embraced the DuPont and NDT contract and received a direct benefit from such contract, it should be estopped from denying the forum selection clause contained within such contract.

C.    THE THIRD PARTY COMPLAINT HAS BEEN PROPERLY SERVED.

Effective service of process is necessary before a Court may exercise personal jurisdiction over a defendant. See *Omni Capital Int'l Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987). Under Convention of the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T361, service can be effectuated on those abroad in signatory countries to the Convention, including the United States and the United Kingdom, through

either the designated Central Authority of that country and/or through registered mail. See Convention of the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T361. Delaware Courts have held that service is accomplished via the Convention through mail when the requirements under the Delaware long arm statute are satisfied. See *Quinn v. Keinicke*, 700 A.2d 147, 155-156 (Del. Super. 1996). Service to a foreign corporation is prescribed by Federal Rules of Civil Procedure Rule 4(f) and (h). See Federal Rules of Civil Procedure Rule 4(f) and (h). Federal Rules of Civil Procedure Rule 4(m), which prescribes 120 days as the time limit for service, does not apply to service under Rule 4(f). See Federal Rules of Civil Procedure Rule 4(m).

In the instant case, there was effective service of process. Mechanical Integrity attempted to accomplish service to NDT in three different manners. Admittedly, the waiver of service did not effectuate service because NDT refused to sign such waiver.

Service through the long arm statute on NDT was proper. Mechanical Integrity complied with the requirements of 10 *Del. C.* § 3104 in that it served the Secretary of the State and sent the prescribed contents to Third Party Defendants via registered mail within 7 days as required by statute. See 10 *Del. C.* § 3104. Upon reasonable research, no Delaware case law was found where a Court held that service was improper under 10 *Del. C.* § 3104 due to referencing the wrong statue section. The case presented by NDT, *Coston v. Brown*, 2004 *Del. Super. LEXIS* 345 at *3 (Del. Super. Ct. Sept. 10, 2004), holding that strict compliance with 10 *Del. C.* § 3104 deals with a Plaintiff who did not send registered mail to the Defendant within the prescribed 7 days. *Id*. Therefore, since Mechanical Integrity complied with 10 *Del. C.* § 3104, service was proper.

Should the Court find that the long arm service was improperly performed, Mechanical Integrity may have properly served NDT through the Hague Convention. The Hague Convention personal service through England's designated Central Authority is still in the process of being served

12

and once performed will be proper service upon NDT. Since service through the Hague Convention is not limited to 120 days as prescribed in Federal Rules of Civil Procedure Rule 4(m), timing of service is still appropriate.

## IV.    CONCLUSION

For the above stated reasons, NDT's Motion to Dismiss should be DENIED. Should the Court grant NDT's Motion to Dismiss, Mechanical Integrity requests that the Court dismiss the action without prejudice so that suit can be brought in another jurisdiction.

REGER RIZZO & DARNALL LLP


*/s/ Louis J. Rizzo, Jr., Esquire*
Louis J. Rizzo, Jr., Esquire (Bar I.D. No. 3374)
1001 Jefferson Plaza, Suite 202
Wilmington, DE 19801
(302) 652-3611
Attorney for Defendant/Third Party Plaintiff
Mechanical Integrity, Inc.

Dated: March 5, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| E.I. DU PONT DE NEMOURS AND COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No.: 07-346 SLR |
| | ) | |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| MECHANICAL INTEGRITY, INC., | ) | |
| | ) | |
| Defendant/Third Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MIKE WALKER AND NDT EQUIPMENT SERVICES LTD., | ) | |
| | ) | |
| Third Party Defendant. | ) | |

## ORDER

AND NOW, TO WIT this _____ day of _____, 2008 having considered Third Party Defendants' Motion to Dismiss Third Party Complaint and Opening Brief in Support of Motion to Dismiss Third Party Complaint, and Defendant/Third Party Plaintiff Mechanical Integrity, Inc.'s Opening Brief in Response to NDT'S Equipment Services LTD and Mike Walker's Motion to Dismiss Third Party Complaint;

IT IS HEREBY ORDERED that Third Party Defendant NDT Equipment Services, LTD and Mike Walker's Motion to Dismiss Third Party Complaint is DENIED.

BY THE COURT:

_____
THE HONORABLE SUE L. ROBINSON

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| E.I. DU PONT DE NEMOURS AND COMPANY, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No.: 07-346 SLR |
| | ) | |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| MECHANICAL INTEGRITY, INC., | ) | |
| | ) | |
| Defendant/Third Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MIKE WALKER AND NDT EQUIPMENT SERVICES LTD., | ) | |
| | ) | |
| | ) | |
| Third Party Defendant. | ) | |

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify on this 5th day of March, 2008 that a true and correct copy of Mechanical Integrity Inc.'s Opening Brief in Response to NDT Services Ltd. and Mike Walker's Motion to Dismiss Third Party Complaint and has been served electronically and/or by first class mail, postage prepaid, to the following:

Kathleen Furey McDonough, Esquire
Sarah E. DiLuzio, Esquire
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE  19899

William J. Marsden, Jr., Esquire
Brian M. Rostocki, Esquire
Fish & Richardson P.C.
919 North Market Street
P.O. Box 1114
Wilmington, DE 19899

REGER RIZZO & DARNALL LLP

/s/ Louis J. Rizzo, Jr., Esquire
Louis J. Rizzo, Jr., Esquire
Delaware State Bar I.D. No. 3374
1001 Jefferson Plaza, Suite 202
Wilmington, DE  19801
(302) 652-3611
Attorney for Defendant Mechanical Integrity, Inc.

Dated:  March 5, 2008

# EXHIBIT "A"

With Postal Insurance: You can purchase postal insurance against
loss of damage, up to $5,000 for merchandise. For more ... .

# Reger
# Rizzo
# Kavulich
# &Darnall LLP

ATTORNEYS AT LAW

SUITE 202
1001 N. JEFFERSON STREET
WILMINGTON, DE 19801
TEL: 302.652.3611
FAX: 302.652.3620
*www.rrkdlaw.com*

LOUIS J. RIZZO, JR.
E-MAIL: *lrizzo@rrkdlaw.com*

December 14, 2007

**BY REGISTERED MAIL**
**RETURN RECEIPT REQUESTED**

NDT Equipment Services Ltd.
157 Central Avenue
Billingham, United Kingdom  TS23 1LF

    Re:   **E.I. du Pont de Nemours and Company v. Mechanical Integrity, Inc.**
          **v. Mike Walker and NDT Equipment Services Ltd.**
          **Case No.: 07-346 SLR**
          **Our File No.: 07-866**

Dear Sir or Madam:

    Enclosed for your information is a copy of the Third Party Complaint which has been filed against you in the United States District Court for the District of Delaware. Also enclosed is a copy of the Third Party Summons served on the Secretary of the State of Delaware.

    Please be advised that under 10 *Delaware Code* §3112, service upon the Secretary of State is as effectual to all intents and purposes as if it had been made upon you personally.

    You have 60 days from the date of service in which to file an Answer to the Complaint. Failure to answer within 60 days, excluding the day of service, will result in a default judgment being entered against you.

    Please advise your insurance provider immediately of this Complaint against you and address any questions you have regarding this matter to them.

               Very truly yours,

               REGER RIZZO KAVULICH & DARNALL LLP

LJR:tah
Enclosures

               Louis J. Rizzo, Jr., Esquire

Registered No.
RE038 598 994 US

| | Reg. Fee $ 10.15 | | |
|---|---|---|---|
| To Be Completed By Post Office | Handling Charge $ | Return Receipt $ 2.15 | |
| | Postage $ 5.40 | Restricted Delivery | |
| | Received by _Buckley_ | | |
| | Customer Must Declare Full Value $ | ☐ With Postal Insurance | |
| | | ☒ Without Postal Insurance | |

Date Stamp

USPS STA. WILMINGTON DE 19801
DEC 14 2007

Domestic Insurance up to
$25,000 is included in the fee.
International Indemnity
is limited.
(See Reverse).

**FROM**

Louis J. Rizzo Jr., Esquire
Reger Rizzo Kavulich + Darnall LLP
1001 Jefferson Plaza, Suite 202
Wilmington, DE 19801

**TO**

NDT Equipment Services Ltd.
157 Central Avenue
Billingham, United Kingdom TS23 1LF

To Be Completed By Customer (Please Print)
All Entries Must Be in Ballpoint or Typed

PS Form **3806,**      **Receipt for Registered Mail**      Copy 1 - Customer
June 2002                                          (See Information on Reverse)

For delivery information, visit our website at *www.usps.com* ®

# EXHIBIT "B"

# Reger
# Rizzo
# Kavulich
# &Darnall LLP

ATTORNEYS AT LAW

SUITE 202
1001 N. JEFFERSON STREET
WILMINGTON, DE 19801
TEL: 302.652.3611
FAX: 302.652.3620
*www.rrkdlaw.com*

ROCHELLE GUMAPAC
E-MAIL: *rgumapac@rrkdlaw.com*

December 6, 2007

**VIA FIRST CLASS MAIL**

Senior Master of the Supreme Court
Queen's Bench Division
Royal Courts of Justice
Strand London  WC  2A  2LL
England, U.K.

Re:     **E.I. du Pont De Nemours and Company v. Mechanical Integrity, Inc.**
        **v. Mike Walker and NDT Equipment Services Ltd.**
        **U.S.D.C. for the District of Delaware C.A. No.: 07-346 SLR**
        **Our File No.: 07-866**

Dear Sir or Madam:

Our office represents Defendant, Mechanical Integrity, Inc., in connection with the above-referenced matter. Defendant, Mechanical Integrity, Inc., filed a Third Party Complaint against Third Party Defendants, Mike Walker and NDT Equipment Services Ltd., in this matter. Please find enclosed six copies of the Third Party Complaint filed against Mike Walker and NDT Equipment Services Ltd. We are requesting that your Court kindly serve the Third Party Complaint upon the Third Party Defendants, Mike Walker and NDT Equipment Services Ltd., through the Hague Convention. They can be served at 157 Central Avenue, Billingham, United Kingdom TS23 1LF. Also enclosed with the Third Party Complaint are the Requests for Service Abroad of Judicial or ExtraJudicial Documents for the completion of service upon the Third Party Defendants.

Should you require anything further from our office, please do not hesitate to contact me. Thank you for your kind attention to this matter.

Very truly yours,

REGER RIZZO KAVULICH & DARNALL LLP

Rochelle Gumapac, Esquire

RG:tah
Enclosures
cc:    Kathleen Furey McDonough, Esquire
      Sarah E. DiLuzio, Esquire

United States Postal Service®

**Customs Declaration and Dispatch Note — CP 72**

CP124004545US

**IMPORTANT:** This item/parcel may be opened officially. Please print in English and press firmly, you are making multiple copies. Please read the Privacy Notice on the Instructions page of this form.

**From**

Sender's Name: Rochelle Grinnage, Esquire
Business: Roger Riggio Kavulich & Bernall UP
Street: 1007 Jefferson Plaza #702
City: Wilmington    State: DE    ZIP+4®: 19801
Country: USA

Sender's Customs Reference (if any): 07-866

**To**

Addressee's Name: Senior Master of the Supreme Court
Business: Queen's Bench Division
Street: Royal Courts of Justice
City: Strand, London WC2A 2LL    State/Province:
Postcode:
Country: England, U.K.

Importer's Reference - Optional (if any)
(Tax code/VAT no./Importer code)

Importer's Telephone/Fax/Email (if known)

Insured Amount (US $)    SDR Value

Detailed Description of Contents (1): Letter and Third Party Complaints (2)

Net Weight (3): lbs. ___ oz.    Total Gross Wt. (4): ___

Value (US $) (5): ___    Total Value (6): ___

For Commercial Senders Only
HS tariff number (7)    Country of origin of goods (8)

Postage and Fees (9)

Check One (10): ☐ LC/Airmail/Priority    ☐ Surface/Nonpriority

Check One (11): ☐ Gift    ☐ Documents    ☐ Commercial sample    ☐ Returned goods    ☐ Merchandise    ☐ Other

Sender's Instructions in Case of Nondelivery (17)
☐ Treat as Abandoned
☐ Return to Sender
NOTE: Item is subject to return charges at sender's expense.
☐ Redirect to Address Below:

Explanation:

Comments (12) (e.g. goods subject to quarantine, sanitary/phytosanitary inspection, or other restrictions)

License Number(s) (13)    Certificate Number(s) (14)    Invoice Number (15)

I certify that the particulars given in this customs declaration are correct and that this item does not contain any dangerous article prohibited by legislation or by postal or customs regulations.

Date and sender's signature (16): R. Grinnage  12/6/07

PS Form **2976-A**, January 2006 (PSN: 7530-01-000-9834)    Do not duplicate this form without USPS® approval.    6-Sender's Copy

# EXHIBIT "C"

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| E.I. DU PONT DE NEMOURS AND COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | C.A. No.: 07-346 SLR |
| v. | ) ) | JURY TRIAL DEMANDED |
| MECHANICAL INTEGRITY, INC., | ) ) | |
| Defendant/Third Party Plaintiff, | ) ) | |
| v. | ) ) | |
| MIKE WALKER AND NDT EQUIPMENT SERVICES LTD., | ) ) ) | |
| Third Party Defendant. | ) | |

**AFFIDAVIT**

STATE OF *Delaware* )
                        ) SS.
COUNTY OF *New Castle* )

    BE IT REMEMBERED, that on this *5th* day of *March* 2008, personally appeared before me, a Notary Public for the State and County aforesaid, Mike Sens, ("Affiant"), who, being by me duly sworn according to law, did depose and say:

    1.    I am an associate of Reger Rizzo & Darnall LLP, counsel for Defendant/Third Party Plaintiff Mechanical Integrity, Inc.

    2.    I am a member of the Bar of the State of Delaware and of this Court.

    3.    I have personal knowledge of the matters stated in this affidavit and would testify truthfully to them if called upon to do so.

    4.    On February 14, 2008, it was confirmed that the Royal Courts of Justice Group, a division of the Queen's Bench, was in the process of performing service on Third Party Defendants, NDT and Mike Walker.

5.    Additionally, it was confirmed to me that once service has been performed, the Royal Courts of Justice Group, a division of the Queen's Bench, would file the return of service directly with the District Court of Delaware.

_Rochelle Gumapac_
Rochelle L. Gumapac

SWORN TO AND SUBSCRIBED before me this _____ day of _____, 2008.

State of _Delaware_
County of _New Castle_

This instrument was acknowledged before me
on _5th_ day of _March_ by _2008_

_Donna Hella_
Notary Public Signature
My Commission Expires _5/1/08_

# EXHIBIT "D"

# FISH & RICHARDSON P.C.

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

January 30, 2008

Suite 1100
919 N. Market Street
P.O. Box 1114
Wilmington, Delaware
19899-1114

Telephone
302 652-5070

Facsimile
302 652-0607

Web Site
www.fr.com

Brian M. Rostocki
302 652-8471

Email
Rostocki@fr.com

**Via E-Mail & US Mail**

Louis J. Rizzo, Jr., Esquire
REGER RIZZO KAVULICH & DARNALL LLP
1001 Jefferson Plaza, Suite 202
Wilmington, Delaware 19801

ATLANTA

AUSTIN

BOSTON

DALLAS

DELAWARE

MUNICH

NEW YORK

SAN DIEGO

SILICON VALLEY

TWIN CITIES

WASHINGTON, DC

Re:    *E.I. du Pont de Nemours and Co. v. Mechanical Integrity, Inc.,*
       **D. Del., C.A. No. 07-346 SLR**

Dear Louis:

I am in receipt of your letter dated January 23, 2008. Please find enclosed a Declaration from Mike Walker wherein Mr. Walker declares that he is a resident of the United Kingdom, is a director of NDT Equipment Services Ltd. ("NDT") and has never been the sole proprietor of NDT. As such and pursuant to your January 23, 2008 letter, please dismiss all claims against Mr. Walker by January 31, 2008. This letter and Mr. Walker's Declaration shall not constitute a waiver of Mr. Walker's or NDT's personal jurisdiction and insufficient service defenses.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

Brian M. Rostocki

BMR:phb
Enclosure
80055162.doc

# EXHIBIT "E"

**DUPONT** **E.I. du Pont de Nemours and Company**

WILMINGTON, DE 19898 U.S.A

MECHANICAL INTEGRITY INC
1423 E FIRST ST
HUMBLE TX   77338

PO number/date
4500104098  /  02 Feb 2004
Contact person/Telephone
Fields, Kathy/502 775-3013
Our fax number
502 775-3032

Your person responsible
Donene Ashley

Your vendor number with us
8015960

Please enter our order as specified below subject to terms and conditions
listed on both the face and/or reverse side of this purchase order. Any
additional or different terms in seller's form(s) are material alterations and
are hereby rejected.
1. If price, terms, and required receiving date or other conditions and instructions
are not acceptable immediately advise buyer shown below.
2. Furnish complete shipping information and include 2 copies of packing list
with each shipment. Show purchase order number / release number on each
package, packing list, invoice, bill of lading, and all correspondence.

Please deliver to:
LOUISVILLE WORKS MFGG 2350 C5
4131
4200 CAMP GROUND RD.
LOUISVILLE KY  40216-4602

Delivery date:     23 Feb 2004

Mail your invoice to address indicated below:
E I DuPont de Nemours and Co., Inc.
Nashville Payment Center
P.O Box 367
Old Hickory, TN 37138

Terms of deliv.: 000 - Delivery terms do not apply
Terms of payt.:  Net 60 days from receipt of invoice
Currency:        USD

Invoices shall be sent to:
  E. I. duPont de Nemours and Company
  P.O. Box 16350
  Louisville, KY  40256
  Attention:  Jennifer Leasor
Insurance certificates shall be presented to DuPont's at the site.
GENERAL CONDITIONS - Contractor will perform all services in
accordance with DuPont's General Conditions GC-1, dated 2-26-04 hereto
and made a part hereof.  Any inconsistent terms or conditions
submitted by Contractor shall not apply unless they are: (1) reduced
to writing and signed by both Parties hereto; and  (2) expressly
referred to as being modifications of the General conditions.
GUIDELINES FOR CONTRACTOR - Contractor shall comply with DuPont's

# E.I. du Pont de Nemours and Company

**DUPONT**

WILMINGTON, DE 19898 U.S.A

MECHANICAL INTEGRITY INC
1423 E FIRST ST
HUMBLE TX  77338

PO number/date                          Page
4500104098 / 02 Feb 2004  2 /    2

Louisville, Kentucky Site Conditions dated 10/16/03, attached hereto
and made a part hereof.  Contractor and any subcontractors may be
required to furnish to DuPont a written safety program that all
Contractor and subcontractor employees shall be required to follow
while on the job site.  Minimum acceptable program shall meet OSHA and
DuPont's requirements

| Item | Material Order qty. | Unit | Description Price per unit | Net value |
|------|---------------------|------|----------------------------|-----------|

00010                              Inspect Chloroform Line at Rohm & Haas
              1.000  Perf Unit

        Inspect Chloroform Line at Rohm & Haas
        R Harold Skidmore  Phone (502) 775-3286  Contract Administrator

        This order issued for contract inspection of the chloroform line
        on Rohm and Haas property per quotation document #3151 and rate
        sheet re-issued Feb. 27, 2004 from John D McMillan (Phone:
        (281)540-0314
        Fax: (281)540-0317)

        John T Stamm  Phone (502) 775-3159

        Work schedule as mutually agreed to by DuPont and Contractor.

# EXHIBIT "F"

## GENERAL SERVICE CONDITIONS

These General Service Conditions apply to any contract, contract order, or other form of agreement in which they are incorporated by reference.

References to the Agreement include these General Service Conditions.

"DuPont" and "Supplier" are the Parties identified as such in the Agreement.

All headings of the Sections of these General Service Conditions and Addendum are inserted for convenience only and shall not affect any construction or interpretation of the Agreement.

### 1. Definitions.
In addition to any terms defined elsewhere in the Agreement, the following terms have the following meanings:

(a) "**Affiliate**" means any person, partnership, joint venture, corporation or other form of enterprise, domestic or foreign, including subsidiaries, which directly or indirectly Control, are Controlled by, or are under common Control with DuPont.

(b) "**Control**" means the direct or indirect ownership of twenty percent (20%) or greater, or any lesser ownership interest if such is the maximum allowed by law.

(c) "**Divested Business**" means any business unit, or any part or portion thereof, as reasonably determined by DuPont, which DuPont sells or otherwise transfers the assets or ownership to a third party acquirer. The term "Divested Business" shall mean such business unit or the acquirer thereof, as applicable.

(d) "**Intellectual Property**" means copyrights (including the right to use, reproduce, modify, distribute, publicly display, and publicly perform the copyrighted work), trademarks (including trademark, trade names, service marks, and trade dress), patents (including the exclusive right to make, use and sell), trade secrets, rights of publicity, rights of privacy, moral rights, goodwill and all other intellectual property rights as may exist now and/or hereafter come into existence and all renewals and extensions thereof, regardless of whether such rights arise under the law of the United States or any other state, country or other jurisdiction.

(e) "**Services**" means all of the services and work provided by Supplier as set forth in the Agreement and the Scope of Work. Services will also include all of the current or future, necessary, customary, and appropriate services to the same extent that such services are, from time to time, provided by Supplier to its other customers when Supplier is supplying services substantially similar to the Services being provided hereunder, even if the specific services are not set forth in the Agreement.

(f) "**Site**" means any DuPont or Affiliate owned or leased premises.

(g) "**Trading Partners**" means current or potential: independent contractors, customers; and suppliers or vendors; and distributors, of DuPont and Affiliates.

(h) Except as provided in any addendum to these General Service Conditions, "**Work Product**" shall mean all drawings, designs, specifications, models, perspectives, ideas and improvements, software and other Intellectual Property developed by Supplier for DuPont in the performance of Services.

### 2. Services Provided by Supplier.
Supplier agrees to provide Services and such personnel as referenced in the Agreement, including the Exhibits hereto. Supplier shall, except as otherwise expressly stated herein, furnish sufficient, competent, fit and knowledgeable personnel, materials, tools, equipment, facilities, permits and services, and do all things necessary to perform the work herein in a safe and environmentally sound manner.

### 3. Location of Service.
Supplier's employees will perform Services at the location(s) provided in the Agreement.

### 4. Personnel.
(a) If service categories are referenced in the Agreement, then personnel, if any, provided by Supplier will be in one (1) or more of the referenced service categories. Services shall be performed in the best and most workmanlike manner by qualified and efficient personnel. DuPont has the right to advise of specific skills required and to review the qualifications of personnel prior to assignment. If DuPont advises Supplier that any individual assigned to DuPont work, or proposed for assignment to DuPont work, fails to meet the requirements set forth by DuPont, or is otherwise deemed unacceptable by DuPont for any other reason, then Supplier shall, at the option of DuPont, replace such individual. Should a Supplier employee assigned under the Agreement be unable to continue performing services because of illness, resignation or any other cause beyond Supplier's reasonable control, then Supplier will make reasonable efforts to replace such personnel with replacement personnel reasonably acceptable to DuPont. If Supplier fails to provide replacement personnel reasonably acceptable to DuPont, then DuPont reserves the right to eliminate all or part of the assignment without further liability.

(b) In the event DuPont wishes to extend an assignment beyond the original expiration date, DuPont will notify Supplier at least fifteen (15) days prior to said expiration. Supplier shall supply the same personnel during the agreed-to extension period unless otherwise determined by DuPont.

(c) DuPont shall have the right to reduce the duration of any assignment at any time. Upon notice from DuPont for any reason (other than a reason prohibited by applicable laws, rules or regulations), Supplier shall remove any Supplier employee as soon as practical.

### 5. Scope.
Supplier hereby agrees that any Affiliate, domestic or foreign, shall have the right, but not the obligation, to receive services under the terms and conditions of the Agreement, without additional royalty or charge, by providing Supplier with written notice of the Affiliate's election to so receive services. If DuPont or the non-United States Affiliate deem it appropriate to conform the terms and conditions of the Agreement to local law, custom and practice, Supplier or its affiliate will use commercially reasonable efforts to enter into

- DuPont Confidential -

Copyright © 2005 E. I. du Pont de Nemours and Company. All rights reserved.

a local written agreement to so effectuate the provisions of the Agreement.

**6.    Independent Contractor.**
The employees, subcontractors, methods, facilities and equipment used by Supplier shall be at all times under its exclusive direction and control. Supplier's relationship to DuPont under the Agreement shall be that of an independent contractor, and nothing in the Agreement shall be construed to constitute Supplier, its subcontractors or any of their employees as an employee, agent, associate, joint venturer, or partner of DuPont. It is agreed that Supplier's employees, who are assigned to DuPont work under the Agreement, shall at all times be and remain employees of Supplier.

**7.    Cooperation with DuPont Contractors.**
Supplier shall cooperate in good faith with DuPont and any DuPont contractor, to the extent reasonably required by DuPont. This cooperation will include, by providing, from time to time, as necessary or appropriate, in writing, to the extent available, applicable requirements, standards and policies for the Services so that the goods and services provided by the DuPont contractor:
(a)  may be:
    (i)   integrated with the goods and services, including the Services DuPont or any third party and .
    (ii)  operated by Supplier, DuPont or any other third party and

(b)  are compatible with the DuPont or contractor computer systems in each such case to the extent necessary to provide the Services.

**8.    Subcontracting and Offshore Outsourcing.**
Supplier's obligations hereunder shall be performed solely by employees of Supplier. Supplier shall not, without DuPont's prior written consent, subcontract or delegate performance of any of its obligations hereunder. Supplier shall be fully responsible for the performance of any such subcontractor or agents. Supplier will not, directly, indirectly or via subcontractors or agents, provide any Services from locations outside the United States without the prior written consent of DuPont.

**9.    Work Product and Title.**
Supplier hereby assigns to DuPont all rights, title and interest in and to all Work Product. This assignment shall not include previously patented or copyrighted Intellectual Property by Supplier or a third party. DuPont hereby grants to DuPont and its Affiliates a nonexclusive, royalty-free, worldwide, perpetual license to use such Supplier or third party Intellectual Property only in conjunction with the use of Work Product.

Should any Work Product qualify for protection under United States patent or copyright law or similar laws in other relevant countries and if DuPont wishes to apply for Intellectual Property protection in the United States or foreign countries, Supplier, at the request of DuPont, shall provide all reasonable assistance to obtain patent and copyright protection or other Intellectual Property protection including execution of papers deemed necessary or advisable for the filing and prosecution of applications, and for providing confirmation of the legal title of DuPont to the inventions, applications, and any Intellectual Property rights granted. DuPont shall bear all costs involved.

**10.    Assignment.**
The Agreement shall not be assignable or otherwise transferable, in whole or in part, by Supplier. The

Agreement shall be assignable or otherwise transferable in whole or in part by DuPont. The terms of these General Service Conditions shall be incorporated into all tier subcontracts.

**11.    Supplier Diversity.**
As required of DuPont by applicable law (e.g., 15 USCA 637) in the United States, and contracts to pass along (i.e., "flow down") to Supplier and to assist DuPont in complying with its corporate supplier diversity goals:

(a)  Supplier shall provide the maximum practicable opportunity to participate in the performance of the Agreement to the types of businesses categorized and defined by applicable law, the U.S. Small Business Administration and the National Minority Supplier Development Council (e.g., small business concerns, including the various types thereof, and minority owned businesses). Supplier shall carry this out in the awarding of subcontracts to such businesses to the fullest extent consistent with the efficient performance of the Agreement.

(b)  Supplier shall (i) report to DuPont, on a quarterly basis, the portion allocated to DuPont of the amounts paid by Supplier to such businesses or (ii) designate an individual who will provide such information to the DuPont Office of Supplier Diversity.

(c)  If required by the Small Business Act, Supplier shall cooperate in studies or surveys to determine compliance with this Section and shall adopt a subcontracting plan as described in such act.

**12.    Child and Forced Labor Prohibition.**
Supplier is fully aware of the DuPont Child and Forced Labor Principles ("DuPont Principles"). Supplier certifies that it does not and will not employ any person to perform services, provide product, or manufacture or supply material for DuPont who is under sixteen (16) years of age, or eighteen (18) years of age in the case of hazardous services or work (hereinafter "Child Labor"), unless Supplier first obtains the written approval of the Vice President of DuPont Sourcing & Logistics.

Supplier certifies that the workers it uses, and will use, to produce product, provide services, or manufacture or supply material are present voluntarily. Supplier certifies that it does not and will not knowingly use forced labor as it is defined in the DuPont Principles.

Supplier understands that these certifications and undertakings are essential to the Agreement. Supplier agrees to indemnify DuPont and hold DuPont harmless with respect to any liability arising from the contravention of this Section by Supplier. Supplier also agrees that, in the event that DuPont determines that a violation of this Section has occurred, DuPont shall notify Supplier and Supplier shall immediately remedy the violation. In the event that DuPont determines that Supplier has not remedied the violation, then DuPont may terminate the Agreement immediately, and such termination shall be with cause.

**13.    Safety and Health.**
Supplier shall:

(a)  comply with all federal, state, and local regulations, and all safety information and instructions as may be set forth in writing or otherwise provided by DuPont, as well as all Site rules and conditions.

- DuPont Confidential -

Form Rev. February 7, 2005

Copyright © 2005 E. I. du Pont de Nemours and Company. All rights reserved.

(b)   designate one (1) person to be responsible for carrying out Supplier's obligations under this Section;

(c)   promptly

(i)   report to DuPont all incidents with potentially adverse safety, health or environmental implications, including slips, falls, equipment malfunctions, fume releases and any situation requiring first-aid or medical observation or treatment, and

(ii)   include, whenever practicable, on-site DuPont medical personnel in the evaluation (by consultation, physical observation, or otherwise) of the involved employees of Supplier;

(d)   promptly report to DuPont all cases Supplier determines to be recordable on the OSHA 300 log or its equivalent and, upon request, provide DuPont with a copy of the OSHA 300 log and all supporting forms;

(e)   maintain an educational program to assure the inclusion of safety instructions as a part of job assignment; and

(f)   properly maintain, inspect, and supervise its designated work area and roadways to prevent unsafe work conditions from existing.  The responsibility includes Supplier's right and duty to conduct reasonable and necessary maintenance in the work area and of the roadways to prevent unsafe work conditions from existing.  Supplier shall regularly conduct safety audits and inspections to ensure compliance with its responsibility to maintain a reasonably safe work area.

Supplier must arrange for first-aid, emergency medical treatment, routine medical treatment, fitness for duty evaluations, drug testing, and other routine occupational medical services; although, upon request and in other appropriate circumstances, DuPont may provide first-aid and emergency medical treatment to stabilize Supplier's employees in connection with on-site incidents or medical emergencies.

If DuPont notifies Supplier of any noncompliance with the provisions of this Section, Supplier shall (immediately, if so directed; otherwise in not more than forty-eight (48) hours after receipt of such notice) make all reasonable efforts to correct the existing conditions. If Supplier fails to correct the existing conditions, DuPont may suspend all or any part of the Services under the Agreement or may terminate the Agreement, without penalty, immediately upon written notice thereof to Supplier. In all other respects, such termination shall be in accordance with the other Sections of the Agreement. In the event Services are suspended, when satisfactory corrective action has been taken by Supplier, a start order shall be issued by DuPont. No part of the time lost due to any such work suspension shall be made the subject for claim for extension of time or for additional costs or damages by Supplier.

14.   **Substance Abuse.**
Supplier shall advise its employees and the employees of its subcontractors and agents that:

(a)   it is the policy of DuPont to prohibit use, possession, sale, manufacture, dispensing, and distribution of alcohol, drugs, or other controlled substances on a Site, and to prohibit in the workplace the presence of an individual with such substances in the body for non-medical reasons;

(b)   entry onto a Site constitutes consent to an inspection of the Supplier employee's person, vehicle, and personal effects when entering, while on, or upon leaving a Site; and

(c)   any Supplier employee who is found in violation of the policy or who refuses to permit inspection may be removed or barred from a Site at the discretion of DuPont.

Supplier, upon request of DuPont, shall not assign or reassign any employee to operations on a Site unless such employee has taken a drug and controlled substance test satisfactory to DuPont, and the test has proved negative for those drugs and controlled substances listed in the document titled "Minimally Acceptable Drug and Alcohol Testing", incorporated herein by reference, copies of which are available to Supplier from the DuPont Contract Administrator.

Supplier also, upon request of DuPont, shall develop and implement procedures, satisfactory to DuPont, to test its employees for alcohol, drug, and controlled substance use when Supplier suspects that a performance deviation, an incident, or unusual behavior of one (1) of Supplier's employees on a Site is related to drug or controlled substance use.

In connection with the above alcohol, drug, and controlled substance testing requirements, Supplier shall secure the written consent of its employees to release results of such tests to DuPont. DuPont shall use such test results only in connection with its decision to permit Supplier's employee to enter or remain on a Site, and to monitor contract compliance. Supplier shall ensure that all drug and controlled substance testing under this Section meets the minimum requirements set forth in the document titled "Minimally Acceptable Drug and Alcohol Testing".

All requirements of this Section shall apply only to the extent permitted by the law of the place where the Services are to be performed.

15.   **Criminal Background Checks.**
To the fullest extent permitted by law, prior to assigning any Supplier employee to perform any Services on a Site, Supplier shall have performed a criminal background check to determine whether such Supplier employee has been convicted of any felony or misdemeanor crime during the prior seven (7) year period, or has any known criminal convictions that occurred beyond the seven (7) year period. Supplier shall not, without the prior written approval of DuPont, permit a Supplier employee to perform Services on a Site if that Supplier employee has been convicted of any felony or misdemeanor crimes.    Supplier's criminal background check program must be in compliance with the Fair Credit Reporting Act and DuPont Contractor Criminal Background Investigation Requirements. In the event of an emergency, and only during the time such criminal background check is being performed, a Supplier employee may temporarily perform Services on a Site if such Supplier employee is escorted one hundred percent (100%) of the time by a DuPont employee.

16.   **Authority.**
The Parties hereby represent that they have full power and authority to enter into the Agreement and perform their respective obligations and duties hereunder, and do not know of any contracts, agreements, promises or undertakings that would prevent the full execution and performance of such obligations and duties.

- DuPont Confidential -

General Service Conditions
Copyright © 2005 E. I. du Pont de Nemours and Company.  All rights reserved.

### 17. Working Arrangements.

DuPont will provide working space, and other services and materials, as DuPont deems appropriate, that may be necessary in connection with the performance of the Services on the Site. Unless specifically requested by DuPont, Supplier's employees shall only provide Services during the normal working hours of DuPont. While on Site, Supplier's employees shall confine themselves to areas designated by DuPont. Supplier's employees will be subject to the badge and pass requirements of DuPont in effect at the site of the Services. Supplier shall also comply with all Site rules, regulations, and guidelines of whatever nature while performing Services at the Site.

### 18. License Grant.

For the term of the Agreement, any term extension, and any termination assistance period hereunder, Supplier hereby grants to DuPont (and DuPont Affiliates and Trading Partners) a fully paid-up, royalty free, worldwide, nonexclusive license to access and use the Services and any Supplier Intellectual Property necessary or appropriate to access and use the Services by an unlimited number of users in accordance with the Agreement (the "License"). The License includes the right: (a) to access and use Services for the benefit of DuPont, Affiliates, any Divested Businesses, and any Trading Parties; and (b) for third parties to access and use the Services, provided such access and use by third parties is to communicate, share or access information, or transact business between or with DuPont, Affiliates, Trading Partner or any Divested Businesses.

### 19. Compensation and Payment.

As full compensation for Services and other obligations under the Agreement, DuPont shall pay Supplier in accordance with the conditions and rates shown in the Price Schedule attached to the Agreement.

### 20. Payment Terms.

Terms of payment shall be net sixty (60) days after DuPont receives a properly prepared and correct Supplier invoice. Supplier's invoice shall be accompanied by such records or other written proof as DuPont deems adequate to verify the billings appearing therein and shall be in a form as may be prescribed by DuPont's Contract Administrator. A properly prepared and correct invoice is an original document received at the proper DuPont address, as designated in an applicable purchase order, that clearly and legibly includes, as a minimum:
(a)   the DuPont Contract Order number and release number (if applicable);
(b)   Supplier's complete name and remit to address;
(c)   "bill to" stating the applicable DuPont entity;
(d)   a detailed description of the Services and/or Materials;
(e)   price, consistent with the Agreement;
(f)   quantity, consistent with the Agreement;
(g)   unit of measure, consistent with the Agreement;
(h)   Supplier's invoice number;
(i)   invoice date;
(j)   total monetary amount and currency base;
(k)   terms of payment, including any applicable discount calculations;
(l)   freight terms;
(m)   if applicable, tax amount/rate information; and
(n)   bill of lading number, rail car number or packing list number as appropriate.

Incomplete invoices shall be returned to Supplier unpaid and unprocessed.

If Supplier's invoice does not indicate that Supplier is an incorporated entity, by use of the words (or abbreviations) "Incorporated", "Corporation", or "P.C." as a part of Supplier's company name, then Supplier shall display its tax identification number (TIN) on the invoice in lieu of such designations. Failure to furnish such information may result in withholding appropriate amounts in accordance with IRS regulations.

Payment shall be considered made when payment checks are mailed by DuPont or when electronic funds transfer through the Automated Clearing House (EFT/ACH) is initiated by DuPont. Supplier's invoice shall be accompanied by such records or other written proof as DuPont deems adequate to verify the billings appearing therein.

Should payment not be received by Supplier as required hereunder, Supplier shall so notify DuPont. Thereafter, Supplier and DuPont shall have thirty (30) days to determine why payment was not received (or sent) and to take such steps as may be reasonably required to comply with these provisions and ensure ongoing compliance with the same.

### 21. Taxes.

Unless otherwise stated in the Agreement, DuPont shall pay value-added tax (VAT), Goods and Services Tax (GST), use, transfer, and similar taxes and surcharges (regardless of how they are denominated) levied by a taxing authority against or upon the goods and/or services (collectively, the "Taxes"). In the alternative, DuPont will provide Supplier with a certificate evidencing exemption of DuPont from payment of or liability for such Taxes. DuPont shall, without liability to Supplier, withhold income or other taxes from payments to Supplier to the extent that such withholding tax may be required by any taxing authority. In no event shall DuPont be responsible for Taxes based upon the net income or assets of Supplier, nor shall DuPont be responsible or liable for any penalties or interest due as a result of Supplier's failure to timely pay any Taxes attributable to the goods and/or services or to timely notify DuPont of such Taxes.

### 22. Lower Competitive Offer.

If at any time DuPont: (a) receives a bona fide offer from a third party to perform or provide comparable or superior Services, in whole or in part, under more favorable terms or at a lower total economic cost to DuPont, including all freight costs, for all or part of such Services performed hereunder; or (b) seeks competitive offers in the marketplace for Services, whether through a bid process or otherwise, and obtains a price and terms that DuPont determines separately or as a package offer lower overall cost to DuPont than the price and terms in effect hereunder, DuPont will notify Supplier of such offer and provide Supplier the opportunity to either be competitive or decline to do so. Supplier's opportunity to participate in the bid process constitutes Supplier's opportunity to exercise this competitive offer provision and be competitive. If Supplier declines to meet the competitive offer, DuPont has the right to purchase any or all Services from the unrelated third party supplier. Any purchases from the unrelated third party supplier shall reduce any amount DuPont is obligated to purchase hereunder.

### 23. Most Favored Nation.

Supplier shall not sell goods, materials, or products purchased under the Agreement nor provide services or comparable services, in whole or in part, to those covered herein, to third parties on better terms or at fees lower than

- DuPont Confidential -

General Service Conditions

Copyright © 2005 E. I. du Pont de Nemours and Company.  All rights reserved.

those set forth herein, without offering such terms or fees to DuPont.

### 24. Business Ethics.
Supplier shall not pay any salaries, commissions or fees (or make any other payments or rebates) to any employee, officer or director of DuPont (or any designee of such employee, officer or director) or favor any such individual with gifts, entertainment, services or goods.

### 25. Records Retention and Site Visitation.
(a) Supplier agrees to maintain, in accordance with generally accepted accounting principles and practices, such records as may be necessary to adequately reflect the accuracy of Supplier's charges and invoices under the Agreement, and to maintain such other additional records as DuPont may from time to time reasonably require. Supplier shall preserve such records for a minimum period of three (3) years from the date of last payment or completion of any relevant federal tax audit, without additional reimbursement or compensation therefore.

(b) Upon notice from DuPont, Supplier shall provide DuPont, its agents and any of its regulators, accountants and auditors (collectively, the "DuPont Auditors") with access to, and any assistance and information that they may require with respect to, the Service locations and Services for purposes of auditing Supplier's compliance with the Agreement (including compliance with the DISO Standards) and the business of DuPont (including compliance with applicable law). If Supplier is notified that an audit identifies that: (1) Supplier is not in compliance with the Agreement, Supplier shall promptly correct such non-compliance; or (2) DuPont is not in compliance with applicable law due to Supplier's acts or omissions, Supplier shall promptly correct such acts or omissions.

### 26. Confidential Information.
(a) Until the number of years set forth in the Agreement after the termination or expiration of the Agreement, any term extensions, and any termination assistance periods provided for in an addendum to these General Service Conditions, or in perpetuity in the case of trade secrets, Supplier shall not disclose to or permit to be used by (except in the furtherance of its responsibilities and obligations hereunder) any third party or entity any technical, commercial, organizational, scientific or business information, or Intellectual Property, of DuPont, Affiliates or Trading Partners, or any other information or Intellectual Property of DuPont or Affiliates designated as confidential at the time of disclosure, or if disclosed orally, designated orally as confidential at the time of disclosure and confirmed in writing within thirty (30) days after such disclosure (collectively "Confidential Information") disclosed to, learned by, or developed by it, its employees or agents under the Agreement. In addition Supplier shall (i) not use the Confidential Information of DuPont other than to fulfill its obligations under the Agreement; (ii) not allow access to the Confidential Information to personnel who do not need access to such information in order to fulfill Supplier's obligations hereunder and; (iii) protect the Confidential Information with at least the same level of care as it uses for its own confidential information of a similar nature but not less than a reasonable level of care.

These restrictions on use and disclosure shall not apply to:

(i) Confidential Information already known to Supplier when it was disclosed by DuPont as demonstrated by prior existing written records of Supplier;

(ii) Confidential Information that is or becomes known to the public through no fault of Supplier, its employees, or agents;

(iii) Confidential Information that is lawfully received by Supplier from a third party where the third party has not required Supplier to maintain the information in confidence;

(iv) Confidential Information developed by Supplier independently of disclosure by DuPont; and

(v) Confidential Information required to be disclosed by court order or otherwise by applicable law.

(b) The foregoing obligations of confidentiality also extend to and bind the employees, permitted subcontractors and agents of Supplier who have been provided access to Confidential Information by Supplier.

(c) Upon request of DuPont, Supplier shall return to DuPont all Confidential Information and all written descriptive matter, including drawings, program listings, blueprints, descriptions, or other papers or documents, which contain or summarize any Confidential Information.

(d) If the Parties have previously entered into a Confidential Information Agreement ("Other Agreement"), the terms of that Other Agreement shall take precedence over the terms of this Confidential Information Section with respect to information that is covered by both this Confidential Information Section and by the Other Agreement, but only to the extent that the Other Agreement offers greater protection for such items than the protection provided for in this Confidential Information Section.

(e) The Agreement and its terms and conditions are considered Confidential Information.

### 27. Unauthorized Acts.
Each Party shall:
(a) promptly notify the other Party of any material unauthorized possession, use or knowledge, or attempt thereof, of the other Party's Confidential Information by any person or entity which may become known to such Party;

(b) promptly furnish to the other Party full details of the unauthorized possession, use or knowledge, or attempt thereof, and assist the other Party in investigating or preventing the recurrence of any unauthorized possession, use or knowledge, or attempt thereof, of Confidential Information;

(c) cooperate with the other Party in any litigation and investigation against third parties deemed necessary by the other Party to protect its proprietary rights; and

(d) promptly use its best efforts to prevent a recurrence of any such unauthorized possession, use or knowledge, or attempt thereof, of Confidential Information.

Each Party shall bear the cost it incurs as a result of compliance with this Section.

### 28. Compliance With Laws and Nondiscrimination.
Supplier shall comply with all applicable laws, ordinances, rules and regulations of governmental authorities, including any import and export control laws and regulations, and, in the United States, all applicable laws, ordinances, rules and regulations covering the production, sale and delivery of the Services, including the Equal Opportunity Clause prescribed in 41 CFR 60-1.4; the Affirmative Action Clause prescribed in 41 CFR 60-250.4, regarding disabled veterans and

Copyright © 2005 E. I. du Pont de Nemours and Company. All rights reserved.

veterans of the Vietnam Era; the Affirmative Action Clause for Handicapped Workers prescribed in 41 CFR 60-741.4; 48 CFR Chapter 1 Subpart 19.7 regarding Small Business and Small Disadvantaged Business Concerns; Affirmative Action Compliance Program (41 CFR 60-1.40); the annual filing of SF-100 Employer Information Report (41 CFR 60-1.7); 41 CFR 60-1.8 prohibiting segregated facilities; the Fair Labor Standards Act of 1938, as amended; the Sarbanes-Oxley Act of 2002, Section 303 and Securities Exchange Act of 1934, as amended, Rule 13b2-2.

### 29. Representations and Warranties.
Supplier represents and warrants:

(a)  All obligations shall be performed in a prompt and professional manner in accordance with industry standards and the Agreement (including any milestones, service levels, or dates set forth therein), free of errors or defects in design, material and workmanship.

(b)  It owns all right, title, and interest in and to, or has sufficient right, title, and interest in, the Services and Supplier Intellectual Property to provide the Services as set forth in the Agreement and to convey to DuPont the Licenses set forth in the License Grant Section and assign the ownership rights pursuant to the Work Product and Title Section herein.

(c)  In the event of breach of the warranties set forth in this Representations and Warranties Section, Supplier, at its expense, shall correct (by repair, replacement or re-performance) such breach as soon as possible, but not more than ten (10) days after notice from DuPont. If the breach is not so corrected, then DuPont, at its option, may either: (i) extend the time for Supplier to correct such breach, if correction is commercially reasonable; (ii) negotiate an appropriate reduction in or refund of Supplier's compensation; or  (iii) terminate the Agreement, in which case, in addition to any other right or remedy DuPont may have, Supplier shall immediately refund to DuPont all amounts paid hereunder. If DuPont selects option (i) but the breach is still not corrected within the extended time, DuPont shall have the same options again.

(d)  EXCEPT AS PROVIDED IN THE AGREEMENT, SUPPLIER MAKES NO IMPLIED WARRANTIES REGARDING THE SERVICES AND SPECIFICALLY DISCLAIMS THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

### 30. General Indemnity.
Each Party ("Indemnitor") shall, to the extent permitted by law, indemnify, defend and hold harmless the other Party from and against any and all claims, demands, complaints or actions of third parties (including employees of the Parties or government agencies) arising from or relating to the Agreement (including personal injury, death, property damage or damage to the environment), to the extent caused or arising out of the negligence, willful misconduct, breach of this Agreement or a related agreement, or violation of law of or by the Indemnitor or any subcontractor of the Indemnitor. Further, in the event the Parties are jointly at fault or negligent, they agree to indemnify each other in proportion to their relative fault or negligence. The claims, demands, complaints and actions covered hereunder include all settlements, losses, liabilities, judgments, court costs, reasonable attorneys' fees, fines, penalties and other litigation costs and expenses arising from or related to such claims, demands, complaints or actions.

### 31. Infringement Indemnity By Supplier.
Supplier will indemnify, defend and hold harmless DuPont from and against any and all claims, demands, complaints, or actions of third parties (including employees of the Parties or government agencies) arising from or relating to the Agreement brought against DuPont alleging that the Service or use of Supplier Intellectual Property infringes any patent, copyright, trade secret or other intellectual property right. The claims, demands, complaints and actions covered hereunder include all settlements, losses, liabilities, judgments, court costs, reasonable attorneys' fees, fines, penalties and other litigation costs and expenses arising from or related to such claims, demands, complaints or actions.

If such a claim is brought against DuPont, DuPont shall give prompt written notice thereof to the Supplier. At Supplier's cost, (a) Supplier shall immediately take control of the defense of such claim and shall engage attorneys acceptable to DuPont to defend such claim and (b) DuPont shall cooperate with Supplier (and its attorneys) in the defense of such claim, provided, however, that DuPont may, at its own cost, participate (through its attorneys or otherwise) in such defense.  No settlement of a claim that involves a remedy other than the payment of money by the Supplier shall be entered into without the consent of DuPont. If Supplier does not assume control over the defense of a claim as provided in this Section, DuPont may defend the claim in such manner as it may deem appropriate, at the cost of the Supplier.  Should use of the Service or Supplier Intellectual Property become, or in the opinion of Supplier be likely to become, the subject of such an infringement claim, Supplier may, at its expense and option, (i) procure for DuPont the right to continue using or receiving the Service or Supplier Intellectual Property free of any liability, or (ii) replace or modify, in whole or in part, the Services or Supplier Intellectual Property to make them non-infringing without degradation.

### 32. Insurance.
(a)  Supplier, at its expense, shall carry and maintain in force at all times relevant hereto the following insurance, on policy forms and with insurance companies authorized to do business in the jurisdiction(s) where work is to be performed and acceptable to DuPont, at the indicated minimum coverage limits, or such higher limits as DuPont may require, or the limits provided under insurance currently held by Supplier as of the Effective Date of the Agreement, whichever is greater.

(i)  Workers' Compensation - Statutory; Employer's Liability - $500,000 per accident/per employee; and such other insurance as may be required by Statutory law. This policy shall include a waiver of subrogation to DuPont.

(ii)  Commercial General Liability (Occurrence Form), including Contractual Liability and liability for Products and Completed Operations, in a combined limit for Bodily Injury and Property Damage - $1,000,000 per occurrence. This policy shall name DuPont as additional insured.

(iii)  Business Automobile Liability, in a combined single limit for Bodily Injury and Property Damage - $1,000,000 per occurrence.

(iv)  Other insurance appropriate for Supplier's business or as required by law.

- DuPont Confidential -

Form Rev. February 7, 2005

General Service Conditions
Copyright © 2005 E. I. du Pont de Nemours and Company. All rights reserved.

(b)  Supplier shall maintain in force the insurance required by this Section and shall seasonably renew all required coverage during the term of the Agreement.

(c)  Upon the request of DuPont, Supplier shall provide DuPont with certificates of insurance evidencing the coverage. Such certificates shall provide that the insurer will give DuPont at least thirty (30) days advance notice of any changes in, or cancellation or non-renewal of, coverage and note any exclusions. If, in connection with the performance of Services under the Agreement, Supplier will not use motor vehicles on the Site other than parking areas, a letter so stating is acceptable in lieu of the automobile insurance certificate.

(d)  Supplier shall require that any subcontractor it employs carry the same coverage in the same limits as set out above, and other coverage as Supplier deems appropriate and shall provide proof.

(e)  Neither failure of Supplier to comply with any or all of the insurance Sections of the Agreement, nor the failure to secure endorsements on policies as may be necessary to carry out the terms and Sections of the Agreement, shall be construed to limit or relieve Supplier from any of its obligations under the Agreement, including the Insurance Section.

## 33.  Term.
The Agreement shall commence as of the Effective Date on the contract order and shall continue in full force and effect for the period set forth in the Agreement unless earlier terminated in whole or in part, as set forth herein: (i) in accordance with the Insolvency; Reorganization Section or other Sections hereof; or (ii) by DuPont, at any time, without cause, upon thirty (30) days prior notice. Termination pursuant to (ii) shall be accomplished without penalty, and shall not relieve or release either DuPont or Supplier from any rights, liabilities or obligations that have accrued under the law or the Agreement prior to the date of such termination.  Supplier shall immediately cease work upon receipt of any notice of termination from DuPont, unless otherwise specified by DuPont in the notice.  DuPont will have the right and option, but not the obligation, to extend the Agreement for an additional number of consecutive one (1) year periods as set forth in the Agreement after the expiration of the initial term or any term extension by providing Supplier with at least thirty (30) days notice thereof prior to the expiration date of the initial term or any term extension, as appropriate.

## 34.  Replacement of Prior Agreements.
The Agreement shall take the place of and entirely supersede any oral or written contracts, agreements, or arrangements that deal with the same subject matter as referenced herein between DuPont and Supplier and set forth in the contract order except for any rights, obligations and liabilities which by the terms of that agreement or the law survive its expiration, termination or cancellation.

## 35.  Termination for Cause.
Either Party may terminate the Agreement if the other Party has materially breached its obligations under the Agreement and fails to correct the breach within thirty (30) days after the defaulting Party's receipt of notice of such breach. The non-defaulting Party also may exercise any other rights available to it at law or in equity.

## 36.  Insolvency; Reorganization.
If Supplier shall: (i) dissolve, transfer, sell, assign, mortgage, encumber, pledge, or otherwise dispose of substantially all of its assets used to perform its obligations hereunder, its accounts receivable from DuPont or over twenty percent (20%) of its ownership or controlling interest (whether in the form of stock or otherwise); (ii) consolidate with or merge into another corporation or permit one (1) or more other corporations to consolidate with or merge into it; (iii) be adjudged bankrupt, make a general assignment for the benefit of its creditors or become insolvent and a receiver shall therefore be appointed; or (iv) contemplate or reasonably expect the occurrence of any event referred to in this Section; then in each case, Supplier shall give DuPont notice of such occurrence as soon as is legally permissible. If such occurrence or proposed occurrence is unacceptable to DuPont, DuPont may terminate the Agreement immediately upon notice thereof to Supplier.  Such termination shall be considered termination for cause.

## 37.  Payment upon Termination.
In the event of termination of the Agreement, for any reason other than a breach and default by DuPont, Supplier shall only be entitled to payment for Services properly performed in accordance with the Agreement prior to the effective date of termination.

## 38.  Force Majeure.
If, and to the extent, that performance by a Party (the "Affected Party") of any of its obligations under the Agreement is prevented, hindered or delayed by fire, flood, earthquakes, other elements of nature or acts of God, acts of war, terrorism, riots, rebellions or revolutions, civil disorders or third party labor strikes or disputes (excluding those involving a Party's agents or other contractors) (each a "Force Majeure Event"), then the Affected Party shall be excused for such non-performance, hindrance or delay for as long as such Force Majeure Event continues; provided, however:  (1) such Force Majeure Event is beyond the reasonable control of the Affected Party and could not be prevented by reasonable precautions; and (2) the Affected Party is diligently attempting to recommence performance (including through alternate means). The Affected Party shall immediately notify the other Party of the occurrence of the Force Majeure Event and describe the Force Majeure Event in reasonable detail.  If the Affected Party does not remove or work around the Force Majeure Event within fifteen (15) days, then DuPont (if Supplier is the Affected Party) or Supplier (if DuPont is the Affected Party) may terminate the Agreement (or affected portion) as of the date (including immediately) specified by such Party in a termination notice to the affected Party.

## 39.  Applicable Law and Jurisdiction.
The Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware without giving effect to the principles of conflicts of law.  The Agreement shall not be governed by the U.N. Convention on Contracts for the International Sale of Goods. The Parties consent and submit exclusively to the jurisdiction and service of process of the courts of the State of Delaware or the courts of the United States located in Delaware.

## 40.  Separate Contracts.
DuPont reserves the right to enter into other agreements in connection with the Services. Supplier shall afford other contractors and DuPont reasonable opportunity for introducing and storing their materials and equipment and for performing their services. Supplier shall properly cooperate, connect and coordinate the performance of the Services with

- DuPont Confidential -

General Service Conditions
Copyright © 2005 E. I. du Pont de Nemours and Company. All rights reserved.

that of other services as shall be in the best interest of the project as determined by DuPont.

**41. Severability.**
In the event that any Section of the Agreement shall be found to be void or unenforceable, such findings shall not be construed to render any other Section of the Agreement either void or unenforceable, and all other sections shall remain in full force and effect unless the Section(s) which is/are invalid or unenforceable shall substantially affect the rights or obligations granted to or undertaken by either Party.

**42. Reservation of Rights.**
Either Party's waiver of any of its remedies afforded hereunder or by law is without prejudice and shall not operate to waive any other remedies either Party shall have available to it, nor shall such waiver operate to waive either Party's rights to any remedies due to a future breach, whether of a like or different character. Furthermore, any termination of the Agreement shall not relieve or release either Party hereto from any rights, liabilities, or obligations, which it has accrued under law or under the terms of the Agreement prior to the date of such termination.

**43. Publicity and Corporate Identity.**
Supplier shall not use the name, tradename, oval, trademarks, service marks or logos of DuPont (DuPont Trademarks) in any publicity releases, news releases, annual reports, product packaging, signage, stationery, print literature, advertising or websites without securing the prior written consent of DuPont Sourcing & Logistics. Supplier shall not, without prior written consent of DuPont, represent, directly or indirectly, that any product or service offered by Supplier, has been approved or endorsed by DuPont. Any DuPont Trademarks that Supplier is given consent to use must always be reproduced distinctively, accurately and consistently and as specified by DuPont. DuPont reserves the right to review and provide final approval of any material produced with approved use of the DuPont Trademarks.

**44. Contract Administrator.**
The Contract Administrator will represent DuPont in the administrative phases of the Services. The Contract Administrator shall maintain an interface with Supplier and shall keep the procurement personnel of DuPont informed at all times of the adequacy of Supplier's performance and progress. In the performance of this assignment, the Contract Administrator shall have no legal right to authorize changes of any kind that are outside the scope and compensation of the Agreement, nor shall the Contract Administrator's actions be construed as giving implied approval of any such change. Except as otherwise specifically provided herein, such changes shall be effected only by a written modification to the Agreement. The DuPont and Supplier Contract Administrators for the Agreement are set forth in the Agreement

**45. Notices.**
All notices and consents required under the Agreement shall be in writing or by facsimile machine confirmed in writing by the next business day. Written notices shall be effective if delivered by hand to the Party entitled to receive the same, or if sent by registered or certified mail, postage prepaid, or by confirmed courier to such Party at the address stated in the Agreement for the receipt of notices or at such other address as directed by written notice hereunder from time to time; and if no such address is stated or directed, if addressed to such Party at the address stated in the Agreement as being the address of such Party. If a provision in the Agreement requires notice within a stated number of

days, such days shall be calendar days unless business days are specified.

Notices, invoices and other correspondence, information, documentation or payment shall be made and provided as set forth in the Agreement. Either Party may change its address for notice hereunder upon no less than thirty (30) days prior written notice thereof to the other Party.

**46. Alternate Dispute Resolution.**
(a) Both Parties understand and appreciate that their long term mutual interests will be best served by affecting a rapid and fair resolution of any claims or disputes that may arise out of the Agreement. Therefore, both Parties agree to use their commercially reasonable efforts to resolve all such disputes as rapidly as possible on a fair and equitable basis. Toward this end both Parties agree to develop and follow a process for presenting, rapidly assessing, and settling claims on a fair and equitable basis. If any dispute or claim arising under the Agreement cannot be readily resolved by the Parties pursuant to the process referenced in this subsection (a), the Parties agree to refer the matter to a panel consisting of one (1) executive, from each Party, not directly involved in the claim or dispute for review or resolution. A copy of the contract terms, agreed upon facts (and areas of disagreement) and concise summary of the basis for each side's contentions will be provided to both executives who shall review the same, confer and attempt to reach a mutual resolution of the issue.

(b) If the dispute cannot be resolved under the process set forth in subsection (a), the Parties may elect to resolve the dispute through non-binding mediation. If mediation is to be utilized, the Parties shall select a single unrelated but qualified mediator who shall hold a hearing (not to exceed one (1) day) during which each Party shall present its version of the facts (supported, if desired, by sworn, written testimony, and other relevant documents), its assessment of damages and its argument. The Parties shall provide the mediator with a copy of the Agreement and copies of all documents provided to their executives under subsection (a) at least ten (10) days prior to the scheduled date of the mediation hearing. The Parties may also provide the mediator with copies of any laws or regulations that they feel are relevant to the dispute. Formal written arguments, legal memoranda and live testimony are discouraged but may be permitted at the discretion of the mediator. Both Parties agree to use commercially reasonable efforts, make any involved employees or documents available to the other Party for its review and use in preparing its position under this Section without the need for subpoena or other court order.

(c) The mediator, within fifteen (15) days of the completion of the hearing, will meet with both Parties and provide each of them, on a confidential basis, with his written views of the strengths and weaknesses of their respective positions. The Parties will then reconvene and, with the assistance of the mediator, attempt to resolve the matter. If resolution cannot be achieved by the Parties within forty-eight (48) hours of this second meeting, the mediator, within fifteen (15) additional days, will issue a written, nonbinding decision on the issue.

(d) If the matter has not been resolved utilizing the processes set forth in this Section and the Parties are unwilling to accept the nonbinding decision of the mediator, either or both Parties may elect to pursue resolution through litigation.

- DuPont Confidential -

General Service Conditions
Copyright © 2005 E. I. du Pont de Nemours and Company. All rights reserved.

(e)  The costs of the mediator shall be borne by the losing Party (determined at mediation or through subsequent litigation). Each Party will bear its own additional costs of mediation.

(f)  If a settlement is reached in a case in which joint liability is alleged, the Parties, subsequent to settlement, shall utilize this Alternate Dispute Resolution procedure to determine the proportion of relative fault.

### 47.  Privacy.
Supplier shall comply with all aspects of the DuPont Privacy Policy as set forth at http://www.dupont.com/corp/global privacy.html (or any subsequent site from time to time designated in writing by DuPont), including the execution of the DuPont form Personal Information Transfer Agreement, if applicable, as reasonably determined by DuPont. Unless agreed otherwise in writing, any personally identifiable information provided by one (1) Party to the other hereunder may only be used for conducting the business transaction(s) that is the subject of the Agreement. DuPont does not consent to Supplier's use of any personally identifiable information provided by DuPont, its subcontractor, affiliate, customer, vendor, or employee, for any direct marketing, nor to the transfer of such information to any third party.

### 48.  Buy DuPont.
It is DuPont policy to preferentially purchase DuPont products, components, ingredients, services, and technology. In fulfilling the Agreement and in support of the above stated policy, Supplier shall use its best efforts to furnish or specify products that, to the fullest extent possible, incorporate materials manufactured by DuPont, if such materials are suitable for the use intended.

### 49.  Changes.
(a)  DuPont, by written direction, may make changes in the Services, which shall be performed under the applicable conditions of the Agreement. Such changes may include (i) addition to or deletion of any part of the Services, including increase or decrease of quantities of Services and addition of new Services, (ii) alteration of specifications and/or design, (iii) alteration of DuPont-provided facilities, equipment, materials, services or sites, or (iv) orders for Supplier to accelerate or delay the performance of Services.

(b)  All changes in Services must be authorized in writing by DuPont before such Service is begun.

(c)  If DuPont and Supplier are unable to agree that an item of Service constitutes a change, or that Supplier is entitled to additional compensation and/or an extension of time for such item of Service, Supplier, upon receipt of a written order signed by DuPont, shall promptly proceed with, and expeditiously perform and/or supply, the item of Service, and shall submit a claim therefore as provided herein below.

(d)  In the event DuPont orders completion of Services being provided on a lump sum basis to be delayed or accelerated, adjustment of Supplier's compensation shall be determined by mutual agreement of the Parties based on Supplier's submission of a written estimate of the cost of the delay or acceleration. DuPont reserves the right, however, to reimburse Supplier for delays on an actual cost basis, in which case Supplier shall document such delays daily. Daily documentation shall include identification of the activities, type and number of workers, and type and quantities of materials and equipment affected by the delay.

(e)  Supplier shall provide, with its price proposal for all proposed changes in Services, such supporting documentation as DuPont may require to evaluate the proposal.

(f)  If the Parties are unable to agree on the amount by which the total amount of the Agreement should be adjusted for a change in Services, DuPont shall provide written notification to Supplier of the adjustment DuPont considers appropriate therefore, and such adjustment shall be effective subject to Supplier's right to submit a claim as provided herein below.

(g)  Any claim by Supplier for an adjustment of its compensation or schedule, or in opposition to an adjustment imposed by DuPont through notice as provided herein above, shall be submitted to DuPont in writing by Supplier within fifteen (15) days of commencement of the event giving rise to such claim, or in the case of an adjustment imposed by DuPont through notice as provided herein above, within fifteen (15) days of Supplier's receipt of such notice. Supplier shall submit to DuPont, in writing, the amount or extent of the claim with supporting data within sixty (60) days of completion of the Services or termination of the event for which it claims an adjustment of its compensation or schedule (unless DuPont allows additional time for Supplier to obtain more accurate cost or other data). Such claim shall be resolved through dispute resolution as provided in the Alternate Dispute Resolution Section hereof. No claim by Supplier shall be valid unless submitted in accordance with this Section.

- DuPont Confidential -

General Service Conditions

Copyright © 2005 E. I. du Pont de Nemours and Company.  All rights reserved.

# EXHIBIT "G"

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| E.I. DU PONT DE NEMOURS AND COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | C.A. No.: 07-346 SLR |
| v. | ) ) ) | JURY TRIAL DEMANDED |
| MECHANICAL INTEGRITY, INC., | ) ) | |
| Defendant/Third Party Plaintiff, | ) ) | |
| v. | ) ) | |
| MIKE WALKER AND NDT EQUIPMENT SERVICES LTD., | ) ) ) | |
| Third Party Defendant. | ) ) | |

## AFFIDAVIT

STATE OF                )
                        )  SS.
COUNTY OF               )

BE IT REMEMBERED, that on this _4th_ day of _March_ 2008, personally appeared before me, a Notary Public for the State and County aforesaid, Mike Sens, ("Affiant"), who, being by me duly sworn according to law, did depose and say:

1. I am over the age of 18 and of sound mind and body.

2. I am a representative for Defendant/ Third Party Plaintiff Mechanical Integrity and have actual knowledge in the captioned matter.

3. Mechanical Integrity orally contracted with NDT Services LTD., specifically through NDT's agent and/or director Mike Walker, to help Mechanical Integrity with the DuPont Kentucky pipeline inspection because of the sophistication and relative newness of the technology needed to perform a "guided wave" ultrasound inspection.

4. NDT and/or Mike Walker, as a director and/or agent of NDT, had previous contractual relationships with Mechanical Integrity.

5.     All contractual agreements between Mechanical Integrity and NDT were undertaken by Mechanical Integrity's late founder, John McMillian.

6.     I have no knowledge as to whether Mr. McMillian ever provided NDT and/or Mike Walker a copy of the DuPont contract but at minimum the terms of the contract were conveyed to Walker in that Walker knew what was required of the inspection.

7.     At the time of the inspection, Mechanical Integrity believed that NDT Services LTD was one of the highest recommended companies in the world performing such "guided wave" ultra sound inspection on a regular basis.

8.     On or about March 31, 2004 to April 1, 2004, an inspection of the chloroform pipeline was conducted at the Dupont Louisville plant.

9.     Mike Walker performed the actual "guided wave" ultra sound inspection at the DuPont Louisville plant held on March 31, 2004 to April 1, 2004.

10.     I assisted Mike Walker as Mechanical Integrity with the above referenced inspection.

11.     During the above mentioned inspection, Dupont employees and/or agents observed the process.

12.     During the March 31, 2004 to April 1, 2004 inspection, Walker used his own tools and/or technology and performed all the duties set forth in the Mechanical Integrity and Dupont contract.

13.     During such inspection, Mike Walker was unable to deploy the equipment and/or test multiple sections of the pipe due to the pipe being submerged under water and/or off its support.

14.     After such inspection, Mike Walker on behalf of NDT drafted a report containing all his observations and/or recommendations as to the Dupont chloroform pipeline.

_____

Mike Sens

SWORN TO AND SUBSCRIBED before me this _4th_ day of _March_, 2008.



Nota... BECKY GLENN
Notary Public, State of Texas
My Commission Expires
October 07, 2011

# EXHIBIT "H"



# NDT

## EQUIPMENT SERVICES LTD

157 Central Av, Billingham, Cleveland. UK
Tel: +44 1642 555575
Fax..+44 1642 555548
e-mail. mikendt1@aol.com

In Association With:

*Report Prepared For:*

| Mechanical Integrity |
|---|

*Dupont*
*Louisville*

*31st March 2004*

# FINAL REPORT





# Wavemaker SE16
# Pipe screening
# System

## CONTENTS

1)      4" Chloroform Line (Tests 1 to 14)
        (Summary of Results)

# Summary of Test Results

| ID | Pipe | Site | Location | Notes | |
|----|------|------|----------|-------|---|
| 1725 | 4" Chloroform | Dupont Louisville | Jump over ~~T1=6.65m~~ 21.8' | 1st test at jumpover section, .237 nom wall NO Significant areas of concern | Cat 1 |
| 1726 | 4" Chloroform | Dupont Louisville | Jump over ~~T2=0.48 elbow~~ 1.6' | 2nd test , ring is on verticle section of jump over. NO Significant areas of concern | Cat 1 |
| 1731 | 4" Chloroform | Dupont Louisville | ~~T3 Road crossing~~ +5.7m to 18.7' entrance | No Significant areas of concern. South of road way | Cat 1 |
| 1733 | 4" Chloroform | Dupont Louisville | ~~T4 Road crossing~~ -3.66 to entrance 12' | North of crossing. Minor indications 20-30% See below for details of indications | Cat 2 |
| 1734 | 4" Chloroform | Dupont Louisville | ✓ T5 Road crossing +1.2m 3.9' | Road crossing Test 5 No Significant areas of concern | Cat 1 |
| 1735 | 4" Chloroform | Dupont Louisville | ✓ T6 Road / Rail +1.5, to first weld 4.9' | No Significant areas of concern | Cat 1 |
| 1736 | 4" Chloroform | Dupont Louisville | ✓ T7 Road / Rail -16.4m to North of cr 53.8' | Minor indications under roadway. 20-30% See below for details of indications | Cat 2 |
| 1737 | 4" Chloroform | Dupont Louisville | ✓ T8 Road crossing +0.56m to 1.8' crossing | No areas of concern | Cat 1 |
| 1738 | 4" Chloroform | Dupont Louisville | T9 Road crossing +4.5m to elbow weld 14.8' | No Significant areas of concern | Cat 1 |
| 1739 | 4" Chloroform | Dupont Louisville | ✓ T10 Road crossing -1.87m to weld 6.1' | North of previous test, road crossing is south. Approx 40% corrosion. See below for details of indications | Cat 2 |
| 1740 | 4" Chloroform | Dupont Louisville | ✓ T11 Road crossing -2.6m 8.5' | No Areas of concern | Cat 1 |
| 1741 | 4" Chloroform | Dupont Louisville | T12 Road crossing + 0.6m to rail crossin 2.0' | South side of rail crossing, pipe has a dog leg. No significant areas of concern | Cat 1 |
| 1742 | 4" Chloroform | Dupont Louisville | T13 Road crossing +1.5m to rail crossing 4.9' | No Areas of concern | Cat 1 |
| 1743 | 4" Chloroform | Dupont Louisville | T14 Rail crossing -1.9m 6.2' | No Significant areas of concern | Cat 1 |
| 1747 | 4" Chloroform | Dupont Louisville | T15 Rail crossing -6.5m 226' | Indications under roadway, estimate 20-30% loss See below for details of indications | Cat 2 |

Key to Above Table:

ID:        File ID Number (for use by NDT)

Pipe:      Pipe identification as supplied by customer

Site:      Test Site Name

Location:  Location of test referred to by Test (T) Number

Notes:     Defect indications (defects greater than 20% are also detailed below
           With more information)

Category:  Cat 1 =  Less than 20% Wall Loss

           Cat 2 =  20% to 50% Wall Loss

           Cat 3 =  Greater than 50%

## TEST LOCATION INFORMATION & LOCATION

Tests 1 & 2





| Tests 1 & 2. | Category 1 |
|---|---|
| No Significant areas of Concern | |

Tests 3 & 4



COVERED AREA OF PIPE 8.5meters WIDE    start of wraping

T4

T3    45°

CROSSING

≈ 20-30% wall loss around
WELD w/ external pitting

≈ 10-20% wall loss around
WELD w/external pitting

Minor
Wall loss,
20-30%



Test 3                                    Test 4

| Tests 3 | Category 1 |
|---|---|
| No Significant areas of Concern | |

| Tests 4 | Category 2 |
|---|---|
| Minor Indications 20 – 30%.  Location:  Elbow weld before entrance. | |

Test 5





| Tests 5 | Category 1 |
|---|---|
| No Significant areas of Concern | |

Tests 6 & 7



Minor Wall loss, 20-30%



| Tests 6 | Category 1 |
|---------|------------|
| No Significant areas of Concern | |

| Tests 7 | Category 2 |
|---------|------------|
| 20 -30% Wall loss 9'.6" – 10.6" From Entrance | |

Tests 8, 9 & 10





| T10 | T8 | T9 |

| Tests 8 | Category 1 |
| --- | --- |
| No Significant areas of Concern | |

| Tests 9 | Category 1 |
| --- | --- |
| No Significant areas of Concern | |

| Tests 10 | Category 2 |
| --- | --- |
| 30-40% Wall Loss 1 -2m North of Road crossing & 1.5 – 2.0m into roadway (from entrance) | |

Tests 11 & 12





| Tests 11 & 12 | Category 1 |
|---|---|
| No Significant areas of Concern | |

## Tests 13, 14 & 15



Test 13                    Test 14 (No Photograph for Test 15)

| Tests 13 | Category 1 |
|---|---|
| No Significant areas of Concern | |

| Tests 14 | Category 1 |
|----------|------------|
| No Significant areas of Concern | |

| Tests 15 | Category 2 |
|----------|------------|
| 20 – 30% Wall loss, 3.5 – 8.8 metres from entrance | |

...............................END OF RESULTS..............................

Tested & Verified By

M. Walker

Guided Wave Level 2
Certificate No:  004/02

# EXHIBIT "I"



# Non-Destructive Testing Report

Guided Wave Inspection
(Long Range Ultrasonics)

Inspection of Road Crossings
**For**

E.I. DuPont
Louisville Facility

Reported By: Mike Walker
Inspection start March 31, 2004

JOB # 3151A



**Guided Wave Inspection**

# TABLE OF CONTENTS

EXECUTIVE SUMMARY                                      1.0

SCOPE OF WORK                                          1.1

INSPECTION RESULTS                                     2.0

DESCRIPTION OF EQUIPMENT                               3.0

*The techniques and procedures applied in this report remain the intellectual property of Mechanical Integrity Inc. The information provided in this report and its attachments are in direct response to the contractual agreement between Mechanical Integrity Inc. and the Client. The Client shall keep confidential all information under or in connection with the Contract and shall not divulge the same to any third party without the written consent of Mechanical Integrity Inc.*



# Guided Wave Inspection

## 1.0 Executive Summary:

| Unit Location | Kentucky | Pipe Description | Chloroform Line |
|---|---|---|---|
| Plant Location | Louisville | Pipe Diameter | 4.0" |
| Job Representative | Harold Skidmore | Pipe Attitude | Horizontal |
| Inspection Technique | Long Range UT | Pipe Nominal Wall | 0.237" |
| Operating Temperature | Ambient | MI Job # | 3151A |

## 1.1 Scope of Work:

Carry out Guided Wave (long range ultrasonic) inspection of 4.0" Chloroform piping under road and rail crossings at DuPont and Rohm and Haas locations.

General Notes:  Pictures and drawings are supplied for location information, tests are carried out at many frequencies and analyzed, the identity (ID) and test number (T) stated below should be quoted if any further information on a particular location is required.



**Guided Wave Inspection**

2.0 Inspection Results

| ID | Pipe | Site | Location | Notes | Category |
|---|---|---|---|---|---|
| 1725 | 4.0" | DuPont | T1 jump over –21.8' elbow | North of jump over | Cat 1 |
| 1726 | 4.0" | DuPont | T2 jump over –1.6' elbow | Ring on vertical section | Cat 1 |
| 1731 | 4.0" | DuPont | T3 crossing +18.7' to entrance | South of roadway | Cat1 |
| 1733 | 4.0" | DuPont | T4 crossing –12.0' to entrance | Minor indications see below | Cat 2 |
| 1734 | 4.0" | DuPont | T5 crossing +3.9' | | Cat 1 |
| 1735 | 4.0" | Rohm and Haas | T6 crossing +4.9' to weld | | Cat 1 |
| 1736 | 4.0" | Rohm and Haas | T7 crossing -53.8' North of crossing | Minor indications see below | Cat 2 |
| 1737 | 4.0" | Rohm and Haas | T8 crossing +1.8' to entrance | | Cat 1 |
| 1738 | 4.0" | Rohm and Haas | T9 crossing +14.8' to elbow | | Cat 1 |
| 1739 | 4.0" | Rohm and Haas | T10 crossing –6.1' to weld | Indications approx. 40% wall loss | Cat 2 |
| 1740 | 4.0" | Rohm and Haas | T11 crossing –8.5' | | Cat 1 |
| 1741 | 4.0" | Rohm and Haas | T12 crossing +2.0' to entrance | Pipe has dog leg under crossing | Cat 1 |
| 1742 | 4.0" | Rohm and Haas | T13 crossing +4.9' to entrance | | Cat 1 |
| 1743 | 4.0" | Rohm and Haas | T14 crossing -6.2' to entrance | | Cat 1 |
| 1747 | 4.0" | Rohm and Haas | T15 crossing –22.6' to entrance | Minor indications see below | Cat 2 |

**Table Key:**

ID:            File ID Number (for use by NDT)
Pipe:          Pipe identification as supplied by customer
Site:          Test Site Name
Location:      Location of test referred to by Test (T) Number
Notes:         Defect indications (defects greater than 20% are also detailed below
               With more information)
Category: Cat 1 = Less than 20% Wall Loss
          Cat 2 = 20% to 50% Wall Loss
          Cat 3 = Greater than 50%



# Guided Wave Inspection

## TEST LOCATION INFORMATION & LOCATION

Tests 1 & 2





| Tests 1 & 2. | Category 1 |
|---|---|
| No Significant areas of Concern | |



# Guided Wave Inspection

Tests 3 & 4



COVERED AREA OF PIPE 8.5 meters WIDE
start of wrapping
T4
T3
45°
CROSSING
≈ 20-30% wall loss around WELD w/external pitting
≈ 10-20% wall loss around WELD w/external pitting

Minor Wall loss, 20-30%



Test 3                         Test 4

| Tests 3 | Category 1 |
|---|---|
| No Significant areas of Concern | |

| Tests 4 | Category 2 |
|---|---|
| Minor Indications 20 – 30%.  Location:  Elbow weld before entrance. | |



# Guided Wave Inspection

Test 5





| Tests 5 | Category 1 |
|---|---|
| No Significant areas of Concern | |



# Guided Wave Inspection

Tests 6 & 7



Minor Wall loss, 20-30%

T6                                        T7

| Tests 6 | Category 1 |
|---|---|
| No Significant areas of Concern | |

| Tests 7 | Category 2 |
|---|---|
| 20 -30% Wall loss 9.5-10.5' From Entrance | |



# **Guided Wave Inspection**

Tests 8, 9 & 10



Minor Wall loss, 30 - 40%

Minor Wall loss, 30 - 40%



T10                          T8                          T9

| Tests 8 | Category 1 |
|---|---|
| No Significant areas of Concern | |

| Tests 9 | Category 1 |
|---|---|
| No Significant areas of Concern | |

| Tests 10 | Category 2 |
|---|---|
| 30-40% Wall Loss 1 -2m North of Road crossing & 1.5 – 2.0m into roadway (from entrance) | |



# Guided Wave Inspection

Tests 11 & 12





T11

T12

| Tests 11 & 12 | Category 1 |
|---|---|
| No Significant areas of Concern | |

# Guided Wave Inspection

Tests 13, 14 & 15





Test 13                     Test 14

(No Photograph for Test 15)

 **Guided Wave Inspection**

| Tests 13 | Category 1 |
|---|---|
| No Significant areas of Concern | |

| Tests 14 | Category 1 |
|---|---|
| No Significant areas of Concern | |

| Tests 15 | Category 2 |
|---|---|
| 20 – 30% Wall loss, 11.5-28.9' from entrance | |

Tested & Verified By

M. Walker

Guided Wave Level 2
Certificate No:  004/02



**Guided Wave Inspection**

## 3.0 Description of Equipment:



Wavemaker SE16
Pipe screening System



**Guided Wave Inspection**

# 3:1 General Information  -  Guided Ultrasonic technique

The Wavemaker Pipe Screening System uses guided waves to screen long lengths of pipes for corrosion or cracks. Conventional ultrasonic testing such as thickness gauging uses bulk waves and only tests the region of structure immediately below the transducer. Therefore, it is an extremely slow process to scan a large structure and it is frequently necessary to resort to testing at a grid of points and hoping that they are representative of the whole structure.

However, even this strategy breaks down when part of the structure is inaccessible because it is either buried or covered in insulation. It is much more attractive to be able to screen a large area of structure from a single transducer location, and this is possible using guided waves which propagate along the structure. The Wavemaker system uses special arrays of transducer elements, referred to as rings, which fit around the pipe under test. After a ring has been fitted around a pipe, the operator uses the Wavemaker system to perform a single test that screens a number of meters of pipe on either side of the test location.

The length of pipe that can be effectively screened on either side of the test location in a single test depends on numerous factors and typically ranges from several tens of meters for pipes in good condition down to a few meters for pipes in poor condition or with certain types of coatings. In order to understand how the Wavemaker system works, the whole ring of transducer elements may be regarded as behaving like a conventional ultrasonic transducer operating in pulse-echo mode. The ring sends out a burst of ultrasonic guided waves and then listens to signals that are reflected back.

Figure (a) shows a schematic diagram of the ring of the Wavemaker system operating on a typical pipe that contains an assortment of features around the test location. A schematic of the corresponding results are shown in Figure (b).





# Guided Wave Inspection



The Wavemaker system is composed of three primary components, labelled in Figure (a) as the transducer ring, the Wavemaker SE16 instrument, and the controlling computer. The transducer rings are specific to a certain pipe size. They use either springs or air pressure to dry couple piezoelectric transducer elements to the pipe being inspected. Internal circuitry allows each transducer ring (and therefore the diameter of the pipe being tested) to be automatically detected by the electronics. All of the signal generation and detection is housed in the Wavemaker SE16 instrument, which operates from an internal rechargeable battery and is connected to a standard laptop PC via a USB or serial connection. The control of the instrument as well as the signal processing and report sheet generation is done via the Wavemaker WavePro software.

 **Guided Wave Inspection**

## 3.2   How the test is performed

### A.  EQUIPMENT PREPARATIONS PRIOR TO INSPECTION

The configuration of the equipment and the choice of transducer rings varies depending on such features as the pipe diameter, pipe condition, coatings, type of supports, and suspected type of defect. In order to obtain optimum results, it is made a checklist that the GUL operator will complete in co-operation with the customers on a site visit. The checklist is found in appendix A. If available, isometric drawings are very helpful, especially for reporting the location of suspected corrosion.

### B.  PIPELINE PREPARATIONS PRIOR TO INSPECTION

In general very little surface preparation is required for testing using this technique because the operating frequency is quite low. The transducers are able to couple directly through paint, thin layers of epoxy, or a small amount of general corrosion. However, if there is any flaking paint or corrosion, this should be scrapped off. In addition, if there is any thick (greater than 1mm) coating, this needs to be removed over an area 300 mm long.

In order to inspect the pipelines that are insulated, the insulation must be removed over a small area, which is typically one meter long. The areas where the insulation should be removed is usually marked on the pipe by GUL operators at a site visit. The transducer rings must be able to contact the pipe wall around the entire circumference of the pipe. Therefore, any heat tracing or wire that is attached to the pipe should be released, leaving a minimum of 200mm between the pipe wall and the wire.

### C.  SURVEY SCHEDULE

The time that it will take to inspect a section of pipe varies depending on the number of features present and accuracy desired. Typically, at the beginning of an inspection job, a couple of hours are spent setting up the equipment and configuring it for the locally experienced conditions. Once this configuration is established, it typically takes an hour to test at 3 to 4 positions if access is good and the pipe does not have many features. If suspected corrosion is found, the area is usually examined at additional frequencies and from both sides of the suspect area. This process is used to try to better classify the extent of the corrosion and can take up to an hour.

### D.  CONFIGURATION OF TEST PARAMETERS

The Wavemaker system allows for a wide variety of test parameters to be adjusted. These adjustments are designed to allow the operator to optimise the system depending on the local conditions. Some of the compromises that need to be made include
- should the system try to inspect as close to the transducer rings as possible or as far as possible
- should the sensitivity be increased, which will reduce the distance that can be inspected in each test

All of the parameters (including things such as the frequency of excitation and the shape of the excitation



# Guided Wave Inspection

signal) that are used in the used are saved with the data file, so that the exact same test could be repeated at a later date.

## E. REPRODUCIBILITY OF THE TEST RESULT

In general, the Wavemaker system is only sensitive to cross sectional losses greater than 5-10 percent of the cross section of the pipe. However, if an inspection result is compared to a previous result at the same location, changes in cross section much smaller than this level (1-2 percent) can be detected. In order use the system to track suspect areas, the Wavemaker automatically saves the tests configuration as well as information about the identified features. The software also stores manually entered information about the location where the test was performed. With this information, current results can be compared to future ones to look for changes. The file size for each test position (which inspects many meters) is usually well less than a megabyte, so the information can be relatively easily archived and provided to the plant operator.

## F. INTERPRETATION OF THE RESULTS

The interpretation of the results is the most difficult part of using guided ultrasonic waves to screen pipes. In order to evaluate the features that are present in the trace, various tools/techniques are available to the operator of the system. These include:
* Common sense – What one expects to find
* Visual inspection – What one saw
* Reflected amplitude (as related to the Distance Amplitude Correction curves)
* Symmetric /non symmetric nature of a reflection
* Phase of reflection
* Orientation of reflection
* Behaviour at different frequencies
* Manual measurement to visual confirmed known echo reflections – support, weld.
* Reverberations that cause phantom echo

Using these tools, a well-trained operator can classify the source of observed reflections. However, this technique is a screening tool that can not be used to give precise 'sizing' of defects or accurate estimations of remaining wall thickness.

 **Guided Wave Inspection**

## 3.3    Equipment Capabilities

| | |
|---|---|
| Pipe sizes | 2 to 36 inch inclusive |
| Wall thickness | 1 to 40 mm |
| Couplant | None |
| Surface preparation | Remove flaking paint / corrosion |
| Material | Metal |
| Temperature range of pipe while inspected | -20 to 120 Celsius |
| Pipe isolation requirements | None |
| Maximum effective test range (the farthest distance that can be inspected) | Max 80 meters on either side of ring (typical 10-30 meters depending on pipe coatings and condition) |
| Minimum effective test range (the nearest distance that can be inspected) | 0.75 meters |
| Coverage | 100% within diagnostic length |
| Sensitivity | Typically, 5-10 % cross sectional area change |
| Pipe contents | Has little effect |
| Frequency range of electronics | 5 - 150 kHz |
| Frequency range of standard transducer elements | 20-55 kHz |
| Digitisers | Up to 64000 points at 12 bit resolution sampled at 1 MHz |
| Digital averaging | Up to 64000 averages |
| Gain range | 20-80 dB |
| Analog Filters (switchable) | 0.4,2,10 kHz high pass 20,40,80,160 kHz low pass |
| Number of transducer channels | 16 |
| Maximum output drive voltage (limited to a 6 ms output burst every 80 ms) | 100 Vpp (35 V rms) |
| Output waveform shape | Arbitrary function generator |
| Communication options | USB and RS232 |

 **Guided Wave Inspection**

The report sheet is divided into several sections, including:

**Location and Configuration**: This section records where and how the test was performed so that the same configuration can be used to track changes over time.

**General Notes**: These contain notes that the operator has entered and usually summarise the results at that test location.

**Notes on Specific Features**: For each feature that the operator has identified as significant, a line is added to the feature table. The labels in the first column can be used to match up this information to echoes in the response that is shown below, from which the location and size columns are taken. If the feature is identified as possible corrosion, the 'ECL' column represents the Estimated Cross-sectional Loss (displayed in percent) that the operator has calculated. This estimation, which is described in more detail later, is very approximate and is mainly used to help with the classification of the severity of the defect, which is shown in the 'Class' column.

**Schematic of Features**: All of the features that are identified from the results (or possibly identified visually in the case of penetrations, supports, drains, etc.) are represented in a small schematic drawing, like the one shown below:





# Guided Wave Inspection

**View of Processed Data**: There is a trace on the bottom of the report sheet, which is similar to an A-scan and displays the processed data. At each change in cross section (or impedance) there is a reflection of the ultrasonic energy that appears as a peak in the trace. In order to help the classification of the observed echoes, DAC curves are shown as dotted lines. In addition, there are two traces shown on the graph, one black and one red. The black trace represents echoes from features that are symmetric around the circumference of the pipe (such as welds and flanges) and the red line represents echoes from non-axi-symmetric features such as corrosion and supports. The ratio of the red and black traces can be used to approximate the circumferential extent of the observed feature. This information is used in conjunction with the Estimated Cross-sectional Loss (ECL) to classify the type of feature (and its severity if it is corrosion). For example, the three following pictures all represent about 10 percent of the cross sectional area (as seen through the total wall of the pipe), however, the scenario on the left (where the loss is concentrated in one area) is far more serious than the one on the right. The ratio of red to black allows the determination of this distribution of loss.



# EXHIBIT "J"



# E. du Pont de Nemours and Company
#### WILMINGTON, DE 19898 U.S.A

*Job 3593*

MECHANICAL INTEGRITY INC
1423 E FIRST ST
HUMBLE TX  77338

<table>
<tr><td colspan="2"><b>Purchase order</b></td></tr>
<tr><td>PO number/date<br>4500405916 / 03 Nov 2005</td></tr>
<tr><td>Contact person/Telephone<br>Fields, Kathy/502 775-3013</td></tr>
<tr><td>Our fax number<br>502 775-3032</td></tr>
<tr><td>Your person responsible<br>Justin Lecourias</td></tr>
</table>

Your vendor number with us
8015960

Please enter our order as specified below subject to terms and conditions listed on both the face and/or reverse side of this purchase order. Any additional or different terms in seller's form(s) are material alterations and are hereby rejected.
1. If price, terms, and required receiving date or other conditions and instructions are not acceptable immediately advise buyer shown below.
2. Furnish complete shipping information and include 2 copies of packing list with each shipment. Show purchase order number / release number on each package, packing list, invoice, bill of lading, and all correspondence.

Please deliver to:                          Delivery date:      27 Oct 2005
LOUISVILLE WORKS MFGG 2350 C5
4131
4200 CAMP GROUND RD.
LOUISVILLE KY  40216-4602

Mail your invoice to address indicated below:
E I DuPont de Nemours and Co., Inc.
Nashville Payment Center
P.O.Box 367
Old Hickory, TN 37138-0367

Terms of deliv.: 000 - Delivery terms do not apply
Terms of payt.:  Net 60 days from date of invoice
Currency:        USD

Please ignore the address above and mail invoices to the Louisville
address listed below.  Should you have any questions, contact Kathy
Fields 502-775-3013.
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
For On-Site Contracted Services and Off-Site Repair Services send
invoices to:
DuPont Louisville Works
Attn: Kari Joplin
P.O. Box 16350
Louisville, KY 40256
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
Attachements:  Site Conditions dated July 26, 2005 and General Terms
and Conditions dated Feb. 7, 2005

**DUPONT**

## E.. du Pont de Nemours and Co pany

WILMINGTON, DE 19898 U.S.A

MECHANICAL INTEGRITY INC
1423 E FIRST ST
HUMBLE TX  77338

PO number/date                    Page
4500405916 / 03 Nov 2005   2 /    2

| Item | Material | | Description | | |
|------|----------|------|-------------|------------|-----------|
| | Order qty. | Unit | | Price per unit. | Net value |

00010                           OUTSIDE INSPECTION OF CHCL3 HEADER
            1.000  Perf Unit                14,000.00            14,000.00

OUTSIDE INSPECTION OF CHCL3 HEADER
THIS IS TO BE DONE BY OUTSIDE VENDOR. THE VENDOR OF RECORD IS
GUIDED ULTRASONICS. I WILL FAX YOU THEIR QUOTE TO HAROLD
SKIDMORE. IF YOU NEED MORE INFORMATION PLEASE CONTACT HAROLD AT
3286.
THE PRICE OF $12,935 IS TO INCLUDE LABOR/EQUIPMENT CHARGES AND
EXCLUDES AIRFARE AND FREIGHT.
THIS WORK IS TO BE SCHEDULED DURING DPE OUTAGE SOMETIME AROUND
THE 14TH OF NOV. PER HAROLD.
Expected value of unplanned services:        14,000.00

        Total net item value excluding tax USD            14,000.00

Send Collect freight invoices for US domestic orders to:
DuPont c/o Cass Information Systems
PO Box 17606
St Louis, MO 63178-7606